1   DAVID M. STERN (State Bar No. 67697)
    ROBERT J. PFISTER (State Bar No. 241370)
2   KLEE, TUCHIN, BOGDANOFF & STERN LLP
    1999 Avenue of the Stars, 39th Floor
3   Los Angeles, California 90067-6049
    Telephone:  (310) 407-4000
4   Facsimile:  (310) 407-9090
    Email:     dstern@ktbslaw.com
5              rpfister@ktbslaw.com

6   Special Counsel for the Debtors

7   PETER M. LIVELY (State Bar No. 162686)
    LAW OFFICE OF PETER M. LIVELY
8   11268 Washington Boulevard, Suite 203
    Culver City, California 90230-4647
9   Telephone:  (310) 391-2400
    Facsimile:  (310) 391-2462
10  Email:     PeterMLively@aol.com

11  Counsel for the Debtors

12

13              UNITED STATES BANKRUPTCY COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                  LOS ANGELES DIVISION

16
    In re:                              Case No.: 2:11-bk-17831-AA
17
    Gene Douglas Balas and Carlos A. Morales,   Chapter 13
18
                            Debtors.     **DEBTORS' OPPOSITION TO THE**
19                                       **U.S. TRUSTEE'S MOTION TO**
                                         **DISMISS AND RESPONSE TO THE**
20                                       **U.S. TRUSTEE'S CONFIRMATION**
                                         **OBJECTION; MEMORANDUM OF**
21                                       **POINTS AND AUTHORITIES;**
                                         **DECLARATION OF GENE**
22                                       **DOUGLAS BALAS; DECLARATION**
                                         **OF CARLOS A. MORALES**
23
                                         Date:    May 11, 2011
24                                       Time:    1:30 p.m.
                                         Place:   Courtroom 1345
25                                                Roybal Federal Building
                                                  255 East Temple Street
26                                                Los Angeles, California 90012

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

# <u>TABLE OF CONTENTS</u>

Page

OPPOSITION AND RESPONSE ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................. 4

I.     INTRODUCTION ............................................................................... 4

II.    FACTUAL BACKGROUND ............................................................... 6

III.   JURISDICTION AND VENUE ........................................................... 9

IV.    DISMISSING THE BANKRUPTCY CASE ON THE GROUND THAT ONE
       OF THE DEBTORS IS NOT A "PERSON OF THE OPPOSITE SEX" IS
       UNCONSTITUTIONAL GENDER DISCRIMINATION ........................... 9

V.     TREATING THE DEBTORS' MARRIAGE AS UNWORTHY OF FEDERAL
       RECOGNITION ALSO CONSTITUTES UNLAWFUL DISCRIMINATION
       ON THE BASIS OF SEXUAL ORIENTATION ....................................... 14

       A.    Classifications Based On Sexual Orientation Warrant Heightened
             Scrutiny ........................................................................... 16

             1.    Lesbians and Gay Men Have Experienced a History of
                   Discrimination ........................................................ 18

             2.    Sexual Orientation Is a Defining and Immutable Characteristic ........... 19

             3.    Lesbians and Gay Men Face Significant Political Obstacles ................. 20

             4.    Sexual Orientation Is Unrelated to the Ability to Contribute to
                   Society ................................................................ 21

       B.    DOMA Cannot Withstand Heightened Scrutiny ............................................. 22

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

i

C.    DOMA Lacks Even A Rational Basis ............................................................ 24

    1.    Rational Basis Review Is Not Toothless ................................. 25

    2.    The Interests Asserted by Congress Cannot Support DOMA ............. 27

        a.    *"Encouraging Responsible*
*Procreation and Child-Bearing"* ................................. 28

        b.    *"Defending and Nurturing*
*Traditional Heterosexual Marriage"* ......................... 29

        c.    *"Defending Traditional Notions of Morality"* ........................... 30

        d.    *"Preserving Scarce Resources"* ................................................. 30

    3.    DOMA Advances No Other Valid Governmental Interests ................. 32

        a.    *"Preserving the Status Quo"* ........................................ 32

        b.    *"Eliminating Inconsistencies and*
*Easing Administrative Burden"* ................................ 33

VI.    CONCLUSION .............................................................................................. 35

**DECLARATION OF GENE DOUGLAS BALAS** ............................................................ 36

**DECLARATION OF CARLOS A. MORALES** ............................................................... 45

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

ii

1

## TABLE OF AUTHORITIES

2

3  **CASES**                                                                    **Page**

4  *Barsky v. Board of Regents,*
5      347 U.S. 442 (1954) ......................................................................... 15

6  *Bd. of Trs. of the Univ. of Ala. v. Garrett,*
       531 U.S. 356 (2001) ................................................................... 25, 26
7

8  *Beller v. Middendorf,*
       632 F.2d 788 (9th Cir. 1980) ............................................................ 17

9  *Bolling v. Sharpe,*
10      347 U.S. 497 (1954) ......................................................................... 14

11  *Bowen v. Gilliard,*
12      483 U.S. 587 (1987) ......................................................................... 18

13  *Bowers v. Hardwick,*
       478 U.S. 186 (1986) ......................................................................... 17
14

15  *Bray v. Alexandria Women's Health Clinic,*
       506 U.S. 263 (1993) ......................................................................... 16

16  *Bolling v. Sharpe,*
17      347 U.S. 497 (1954) ......................................................................... 14

18  *Caban v. Mohammed,*
19      441 U.S. 380 (1979) ......................................................................... 11

20  *Califano v. Goldfarb,*
       430 U.S. 199 (1977) ......................................................................... 11
21

22  *Califano v. Westcott,*
       443 U.S. 76 (1979) .................................................................. 11, 12, 13

23  *Christian Legal Society v. Martinez,*
24      130 S. Ct. 2971 (2010) ............................................................... 15, 16

25  *Citizens for Equal Protection v. Bruning,*
26      455 F.3d 859 (8th Cir. 2006) ............................................................ 20

27  *City of Cleburne v. Cleburne Living Ctr.,*
       473 U.S. 432 (1985) .....................................................................*passim*

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

*Colgate v. Harvey*,
  296 U.S. 404 (1935) ................................................................................................. 15

*Craig v. Boren*,
  429 U.S. 190 (1976) ................................................................................................. 11

*Davis v. Passman*,
  442 U.S. 228 (1979) ................................................................................................. 14

*Dragovich v. U.S. Dep't of the Treasury*,
  2011 WL 175502, 2011 U.S. Dist. LEXIS 4859 (N.D. Cal. 2011) ........................... *passim*

*Edwards v. California*,
  314 U.S. 160 (1941) ................................................................................................. 15

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972) ................................................................................................. 27

*F.S. Royster Guano Co. v. Commonwealth of Virginia*,
  253 U.S. 412 (1920) ............................................................................................. 6, 14

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ........................................................................................... 23, 25

*Flores v. Morgan Hill Unified School Dist.*,
  324 F.3d 1130 (9th Cir. 2003) .................................................................................. 15

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ..................................................................................... 11, 20, 21

*Gill v. Office of Pers. Mgmt.*,
  699 F. Supp. 2d 374 (D. Mass. 2010) ................................................................... *passim*

*Golinski v. Office of Pers. Mgmt.*,
  2011 WL 1044643, 2011 U.S. Dist. LEXIS 34969 (N.D. Cal. 2011) ......................... 2

*Griffin v. Illinois*,
  351 U.S. 12 (1956) ................................................................................................... 14

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ................................................................................................... 7

*Grogan v. Garner*,
  498 U.S. 279 (1991) ............................................................................................... 7, 8

*Haddock v. Haddock*,
  201 U.S. 562 (1906) ................................................................................................. 26

iv

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

*Hampton v. Mow Sun Wong*,
   426 U.S. 88 (1976) .................................................................................... 26

*Hatheway v. Sec'y of the Army*,
   641 F.2d 1376 (9th Cir. 1981) .................................................................. 17

*Heller v. Doe*,
   509 U.S. 312 (1993) ................................................................................. 26

*Hernandez-Montiel v. INS*,
   225 F.3d 1084 (9th Cir. 2000) .................................................................. 19

*High Tech Gays v. Def. Indus. Sec. Clearance Office*,
   895 F.2d 563 (9th Cir. 1990) ............................................................. 17, 19

*In re Golinski*,
   587 F.3d 901 (9th Cir. Jud. Council 2009) ......................................... *passim*

*In re Golinski*,
   587 F.3d 956 (9th Cir. Jud. Council 2009) ......................................... *passim*

*In re Jephunneh Lawrence & Assocs. Chartered*,
   63 B.R. 318 (Bankr. D.D.C. 1986) ............................................................ 7

*In re Kandu*,
   315 B.R. 123 (Bankr. W.D. Wash. 2004) ................................................... 2

*In re Levenson*,
   560 F.3d 1145 (9th Cir. Jud. Council 2009) ....................................... *passim*

*In re Levenson*,
   587 F.3d 925 (9th Cir. Jud. Council 2009) ........................................ *passim*

*In re Marriage Cases*,
   183 P.3d 384 (Cal. 2008) .......................................................................... 10

*Karouni v. Gonzales*,
   399 F.3d 1163 (9th Cir. 2005) .................................................................. 19

*Kelo v. City of New London*,
   545 U.S. 469 (2005) ................................................................................. 27

*Kirchberg v. Feenstra*,
   450 U.S. 455 (1981) ................................................................................. 11

*Lawrence v. Texas*,
   539 U.S. 558 (2003) ............................................................................ *passim*

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

*Local Loan Co. v. Hunt*,
    292 U.S. 234 (1934) ................................................................................ 7, 8

*Lofton v. Sec'y of Dep't of Children & Family Servs.*,
    358 F.3d 804 (11th Cir. 2004) ................................................................ 20

*Massachusetts v. Dep't of Health & Human Servs.*,
    698 F. Supp. 2d 234 (D. Mass. 2010) ..................................................... 26

*Matthews v. De Castro*,
    429 U.S. 181 (1976) ................................................................................ 25

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010) ............................................................................ 16

*Mississippi Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ................................................................................ 11

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................ 26

*Nguyen v. INS*,
    533 U.S. 53 (2001) .................................................................................. 13

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) .................................................................................. 6, 14

*Orr v. Orr*,
    440 U.S. 268 (1979) ................................................................................ 11

*Palmore v. Sidotti*,
    466 U.S. 429 (1984) ................................................................................ 22

*Perry v. Commerce Loan Co.*,
    383 U.S. 392 (1966) .................................................................................. 7

*Perry v. Proposition 8 Official Proponents*,
    587 F.3d 947 (9th Cir. 2009) .................................................................. 19

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010) ............................................. *passim*

*Plyler v. Doe*,
    457 U.S. 202 (1982) .......................................................................... *passim*

*Reed v. Reed*,
    404 U.S. 71 (1971) ......................................................................... 5, 10, 11

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

*Romer v. Evans,*
 517 U.S. 620 (1996) ............................................................................... *passim*

*Shapiro v. Thompson,*
 394 U.S. 618 (1969) ...................................................................................... 31, 32

*Stanton v. Stanton,*
 421 U.S. 7 (1975) ................................................................................................. 11

*Strauss v. Horton,*
 207 P.3d 48 (Cal. 2009) ................................................................................... 6, 20

*Taylor v. Louisiana,*
 419 U.S. 522 (1975) ............................................................................................ 11

*United States Dep't of Agric. v. Moreno,*
 413 U.S. 528 (1973) ................................................................................. 25, 28, 30

*United States v. Carolene Prods. Co.,*
 304 U.S. 144 (1938) ............................................................................................ 16

*United States v. Kras,*
 409 U.S. 434 (1973) ............................................................................................ 14

*United States v. Virginia,*
 518 U.S. 515 (1996) ...................................................................................*passim*

*Vance v. Bradley,*
 440 U.S. 93 (1979) ....................................................................................... 23, 26

*Village of Willowbrook v. Olech,*
 528 U.S. 562 (2000) ............................................................................................ 15

*Watkins v. U.S. Army,*
 875 F.2d 699 (9th Cir. 1989) .............................................................................. 21

*Weinberger v. Wiesenfeld,*
 420 U.S. 636 (1975) ............................................................................................ 11

*Wengler v. Druggists Mut. Ins. Co.,*
 446 U.S. 142 (1980) ............................................................................................ 11

*Witt v. Dep't of Air Force,*
 527 F.3d 806 (9th Cir. 2008) ....................................................................*passim*

*Witt v. Dep't of Air Force,*
 739 F. Supp. 2d 1308 (W.D. Wash. 2010) ........................................................ 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

## STATUTES

1 U.S.C. § 7 ........................................................................................... *passim*

11 U.S.C. § 302 .................................................................................... *passim*

11 U.S.C. § 1307 ......................................................................................... 1, 2

28 U.S.C. § 157 ............................................................................................... 9

28 U.S.C. § 1334 ............................................................................................. 9

28 U.S.C. § 1408 ............................................................................................. 9

28 U.S.C. § 1409 ............................................................................................. 9

28 U.S.C. § 1930 ............................................................................................. 8

CAL. FAM. CODE § 751 ................................................................................... 8

CAL. FAM. CODE § 760 ................................................................................... 8

CAL. FAM. CODE § 910 ................................................................................... 8

## OTHER AUTHORITIES

2 COLLIER ON BANKRUPTCY ¶ 302.02 (16th ed., rev. 2010) ...................................... 8

8 COLLIER ON BANKRUPTCY ¶ 1300.02 (16th ed., rev. 2010) .................................... 7

Gerald Gunther, *In Search Of Evolving Doctrine On A Changing Court:
A Model For A Newer Equal Protection*, 86 HARV. L. REV. 1 (1972) ........................... 16

1    **TO THE HONORABLE THOMAS B. DONOVAN,[1] UNITED STATES**

2    **BANKRUPTCY JUDGE; PETER C. ANDERSON, UNITED STATES TRUSTEE;**

3    **HATTY K. YIP, TRIAL ATTORNEY; KATHY A. DOCKERY, CHAPTER 13**

4    **TRUSTEE; AND ALL CREDITORS AND PARTIES IN INTEREST:**

5         Gene Douglas Balas and Carlos A. Morales, the debtors (together, the "Debtors") in

6    the above-captioned chapter 13 bankruptcy case (the "Bankruptcy Case"), hereby (i) oppose

7    the *United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 1307(c), or For*

8    *Related Relief* [Docket No. 28], filed April 15, 2011 (the "Motion to Dismiss"), and

9    (ii) respond to the *United States Trustee's Objection to Confirmation of Plan; and*

10   *Declaration of Hatty Yip in Support Thereof* [Docket No. 26], filed April 15, 2011 (the

11   "Confirmation Objection" and the "Yip Declaration").

12        By the Motion to Dismiss and Confirmation Objection, the U.S. Trustee seeks

13   dismissal of the Bankruptcy Case and denial of confirmation solely on the ground that the

14   Debtors' joint bankruptcy filing is prohibited by the federal Defense of Marriage Act, Pub.

15   L. No. 104-199, 110 Stat. 2419 (Sep. 21, 1996), *codified in pertinent part at* 1 U.S.C. § 7

16   ("DOMA"), notwithstanding the undisputed fact that the Debtors "were legally married in

17   the state of California on August 30, 2008, and were still married as of the date of filing the

18   petition," Motion at 3:17-18.   The U.S. Trustee offers no basis for dismissal of the

19   Bankruptcy Case or denial of confirmation other than the observation that "Debtors appear to

20   be two males," Yip Decl. ¶ 2, and thus concedes that – but for the application of DOMA –

21   the Debtors are entitled to avail themselves of the benefit of "filing . . . a single petition," 11

22   U.S.C. § 302(a), and the incidents thereof, *see*, *e.g.*, LBR 1015-1(a).

23        The Debtors respectfully submit that the Motion to Dismiss should be denied and the

24   Confirmation Objection should be overruled.   As set out in the annexed Memorandum of

25   Points and Authorities, and as further elucidated in the annexed Declaration of Gene Douglas

26   

27   [1]   By Public Notice 11-008 (issued April 14, 2011), the Clerk of the Court has advised that this
     case is among those that will be automatically reassigned from the Honorable Alan M. Ahart to

28   the Honorable Thomas B. Donovan on May 2, 2011, which is after the date of this filing but
     prior to the date of the hearing to which it relates.

1

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

Balas (the "Balas Declaration") and Declaration of Carlos A. Morales (the "Morales Declaration"), section 3 of DOMA cannot constitutionally be applied to the Debtors, who are legally married under state law – a conclusion already reached by the President of the United States and the Attorney General of the United States. *See* Letter from Hon. Eric H. Holder, Jr. to Hon. John A. Boehner, dated Feb. 23, 2011, *available at* 2011 WL 641582 (the "Holder Letter") (appended hereto as **Tab A**).[2]  The same conclusion has been reached by every court to have squarely considered the question. *See In re Levenson*, 560 F.3d 1145 (9th Cir. Jud. Council 2009) ("*Levenson I*") (appended hereto as **Tab B**); *In re Levenson*, 587 F.3d 925 (9th Cir. Jud. Council 2009) ("*Levenson II*") (appended hereto as **Tab C**); *Dragovich v. U.S. Dep't of the Treasury*, No. 10-01564-CW, 2011 WL 175502, 2011 U.S. Dist. LEXIS 4859 (N.D. Cal. Jan. 18, 2011) (the slip opinion of which is appended hereto as **Tab D**); *Gill v. Office of Pers. Mgmt.*, 699 F. Supp. 2d 374 (D. Mass. 2010) (appended hereto as **Tab E**).  This Court should reach the same conclusion as the President and the Attorney General (in the Holder Letter), Judge Reinhardt (in *Levenson I* and *Levenson II*),[3] Judge Wilken (in *Dragovich*), and Judge Tauro (in *Gill*).  No court has squarely concluded otherwise,[4] and the Debtors respectfully submit that this Court should not be the first.

---

[2]  A duly authenticated copy of the Holder Letter was Exhibit B to the previously filed *Declaration of Robert J. Pfister* ("Pfister Declaration") in support of *Debtors' Application to Employ Klee, Tuchin, Bogdanoff & Stern LLP as Special Counsel on a Pro Bono Basis in Connection with Certain Specified Matters* [Docket No. 21], filed April 1, 2011 (the "Employment Application"). The Debtors join the *Request for Judicial Notice in Support of United States Trustee's Notice of Motion and Motion to Dismiss Pursuant to 11 U.S.C. § 1307(c) or For Related Relief* [Docket No. 29] and the *Request for Judicial Notice in Support of United States Trustee's Notice of Objection and Objection to Confirmation of Plan* [Docket No. 27], both filed April 15, 2011, which ask the Court to take judicial notice of, among other things, the Employment Application and all exhibits attached thereto.

[3]  *Levenson I* and *Levenson II* are decisions issued by Judge Reinhardt in his administrative capacity as a member of the Ninth Circuit Judicial Council, just as *In re Golinski*, 587 F.3d 901 (9th Cir. Jud. Council 2009) ("*Golinski I*") and *In re Golinski*, 587 F.3d 956 (9th Cir. Jud. Council) ("*Golinski II*") are decisions issued by Chief Judge Kozinski in the same capacity. *See generally Golinski v. Office of Pers. Mgmt.*, 2011 WL 1044643, at *7, 2011 U.S. Dist. LEXIS 34969, at *18 (N.D. Cal. Mar. 16, 2011).

[4]  *In re Kandu*, 315 B.R. 123 (Bankr. W.D. Wash. 2004), is the only decision arguably to the contrary.  That case, however, concerned a Washington couple whose Canadian marriage was not recognized in their home state. *Id.* at 130; *see also id.* at 133 ("Washington State has adopted its own definition of marriage identical to DOMA . . . .").

1    Pursuant to LBR 9013-1(f)(1), the Debtors hereby "advise the adverse party that any

2    reply to [this] opposition must be filed with the court and served on [the Debtors] not later

3    than 7 days prior to the hearing on the motion," as set out in LBR 9013-1(g), and further

4    advise that any evidentiary objection to the declarations and other evidence submitted

5    herewith "may be deemed waived unless it (A) is set forth in a separate document; (B) cites

6    the specific Federal Rule of Evidence upon which the objection is based; and (C) is filed

7    with the . . . reply papers," as set out in LBR 9013-1(i)(2).

8    WHEREFORE, the Debtors respectfully request that the Court deny the Motion to

9    Dismiss, overrule the Confirmation Objection, and grant such other and further relief as may

10    be warranted.

11    Dated:    April 27, 2011              KLEE, TUCHIN, BOGDANOFF & STERN LLP

12

13              ___/s/ Robert J. Pfister_____

14              DAVID M. STERN (State Bar No. 67697)
         ROBERT J. PFISTER (State Bar No. 241370)
15         1999 Avenue of the Stars, 39th Floor
         Los Angeles, California 90067-6049
16         Telephone:    (310) 407-4000
         Facsimile:    (310) 407-9090
17         Email:    dstern@ktbslaw.com
18                   rpfister@ktbslaw.com

19         *Special Counsel for the Debtors*

20

21         LAW OFFICE OF PETER M. LIVELY

22

23              ___/s/ Peter M. Lively_____
         PETER M. LIVELY (State Bar No. 162686)
24         11268 Washington Boulevard, Suite 203
         Culver City, California 90230-4647
25         Telephone:    (310) 391-2400
         Facsimile:    (310) 391-2462
26         Email:    PeterMLively@aol.com
27
         *Counsel for the Debtors*
28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Like millions of Americans affected by the financial crisis of late, the Debtors have been driven by extended unemployment and unreimbursed medical expenses to seek the protection and fresh start afforded by the Bankruptcy Code.  And like countless Americans, the Debtors have committed to sharing with each other their lives (and their livelihoods) in lawful matrimony – for better, for worse; for richer, for poorer; in sickness and in health. The Debtors also happen to be two men.  It is solely on account of this latter circumstance that the Court is asked to dismiss this case and deny the Debtors a right that is automatically and unquestioningly afforded to every legally married heterosexual couple.

Nothing in the Bankruptcy Code restricts joint bankruptcy filings on the basis of gender or sexual orientation.  To the contrary, section 302 of the Bankruptcy Code specifically authorizes joint filings by any "individual . . . and such individual's spouse."  11 U.S.C. § 302(a).  Nor is there any warrant in the Bankruptcy Code for this Court to look behind the Debtors' perfectly valid California marriage certificate to ascertain whether the legal union it memorializes is between persons of the same or the opposite gender.  Instead, the proffered legal impediment to the Debtors' joint petition is DOMA, a 1996 non-bankruptcy law purporting to impose gender restrictions on every use of the term "spouse" in "any Act of Congress [and] any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States . . . ."  1 U.S.C. § 7.  DOMA effectively re-writes the first sentence of section 302 of the Bankruptcy Code to read:

> A joint case under a chapter of this title is commenced by the filing with the bankruptcy court of a single petition under such chapter by an individual that may be a debtor under such chapter and ~~such individual's spouse~~ a person of the opposite sex who is a husband or a wife.

11 U.S.C. § 302(a), modified to replace "such individual's spouse" (the language enacted by Congress in 1978) with the gender-restrictive definition provided in DOMA (under which "the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife").

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1    DOMA cannot constitutionally be applied here.  Dismissing the Bankruptcy Case on

2    the ground that one of the Debtors is not "a person of the opposite sex," 1 U.S.C. § 7, is

3    nothing more and nothing less than unconstitutional gender discrimination.  A line of

4    Supreme Court cases stretching back four decades to the unanimous decision in *Reed v.*

5    *Reed*, 404 U.S. 71 (1971), holds that the government may not arbitrarily treat people

6    differently on account of their gender.  Here, there is no question that the Debtors are

7    lawfully married "spouses" as required by the plain text of section 302 of the Bankruptcy

8    Code.  Whether they are also "of the opposite sex," 1 U.S.C. § 7, has no conceivable

9    connection to their fitness to be joint debtors – and certainly not the "exceedingly persuasive

10   justification" required under settled Supreme Court precedent "to defend gender-based

11   government action," *United States v. Virginia*, 518 U.S. 515, 531 (1996) ("*VMI*").

12   Treating the Debtors' marriage as unworthy of federal recognition also constitutes

13   unlawful discrimination on the basis of sexual orientation.  This Court should reach the same

14   conclusion the Executive Branch reached in the Holder Letter, which is what every court to

15   have squarely addressed the issue has also held:  DOMA's attempt to disfavor certain valid

16   marriages unlawfully deprives the parties to those unions of the equal protection of the law.

17   *See* Holder Letter [Tab A] at 1 ("[T]he President of the United States has made the

18   determination that Section 3 of [DOMA], as applied to same-sex couples who are legally

19   married under state law, violates the equal protection component of the Fifth Amendment.");

20   *accord Levenson I*, 560 F.3d at 1151; *Levenson II*, 587 F.3d at 931; *Dragovich*, slip op. [Tab

21   D] at 25; *Gill*, 699 F. Supp. 2d at 397.  Notably, this straightforward conclusion does not

22   require the Court to weigh in on the constitutionality *vel non* of restricting marriage to

23   opposite-gender couples, which was the question presented in *Perry v. Schwarzenegger*, 704

24   F. Supp. 2d 921 (N.D. Cal. 2010) ("*Perry*") (striking down Proposition 8).  Rather, the only

25   issue in this Bankruptcy Case is whether some legally married couples are entitled to fewer

26   rights than other legally married couples, based solely on a factor (the gender and/or sexual

27   orientation of the parties to the union) that finds no support in the Bankruptcy Code or Rules

28   and should be a constitutional irrelevancy.

1   The equal protection component of the Fifth Amendment "keeps governmental

2   decisionmakers from treating differently persons who are in all relevant respects alike."

3   *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citing *F.S. Royster Guano Co. v. Commonwealth*

4   *of Virginia*, 253 U.S. 412, 415 (1920) ("all persons similarly circumstanced shall be treated

5   alike")).   As a lawfully wedded couple, the Debtors are constitutionally indistinguishable

6   from opposite-gender married couples who enjoy the rights and responsibilities attendant to

7   joint bankruptcy petitions.   DOMA's irrational insistence to the contrary "is not within our

8   constitutional tradition," as it violates "the principle that government and each of its parts

9   remain open on impartial terms to all who seek its assistance."   *Romer v. Evans*, 517 U.S.

10   620, 633 (1996).   DOMA, as the U.S. Trustee seeks to apply it in this Bankruptcy Case, is

11   inconsistent with the Constitution's guarantee of equal treatment.   The Motion to Dismiss

12   should be denied and the Confirmation Objection should be overruled.

## II.

### FACTUAL BACKGROUND

15   The Debtors are indisputably a lawfully married California couple.   *See* Pfister Decl.

16   Ex. A (Debtors' License and Certificate of Marriage); Balas Decl. ¶ 2 ("[We] were married

17   in California on August 30, 2008, and we remain married to this day.   We publicly hold

18   ourselves out as a married couple, and our family, friends and business associates recognize

19   us as such."); Morales Decl. ¶ 2 (same); Motion to Dismiss at 3:17-18 (conceding that

20   Debtors "were legally married in the state of California on August 30, 2008, and were still

21   married as of the date of filing the petition"); *see also Strauss v. Horton*, 207 P.3d 48, 119-22

22   (Cal. 2009) (clarifying that the approximately 18,000 same-gender couples who legally wed

23   in California prior to the November 2008 passage of Proposition 8 remain validly married for

24   all purposes under California law).

25   The annexed declarations set out in moving detail how the Debtors met, fell in love,

26   married, and built a life together, overcoming along the way challenges of discrimination and

27   illness.   This evidence also shows that the Debtors experience their sexual orientation as an

28   innate aspect of their personhood – fixed, unchanging, and wholly unrelated to their fitness

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1  for jointly seeking bankruptcy protection under section 302 of the Bankruptcy Code.  In

2  addition, even though no heterosexual married couple seeking bankruptcy protection is

3  obliged to prove why their marriage is worthy of recognition and respect, the Debtors'

4  declarations put the lie to the ugly premise of DOMA – that same-gender marriages do not

5  "count," and that parties to these unions should be treated as strangers (or perhaps

6  roommates) instead of lawfully wedded spouses.  *Cf.* Motion to Dismiss at 4:11-16 (relying

7  on cases such as *In re Jephunneh Lawrence & Associates Chartered*, 63 B.R. 318 (Bankr.

8  D.D.C. 1986), where the court dismissed a petition jointly filed by a corporation and its sole

9  shareholder).  The Debtors are not strangers, mere roommates, or related corporate entities;

10 they are lawfully wedded spouses who have undertaken a lifelong commitment to each other.

11 They ought to be treated as such.[5]

12       Following an extended period of unemployment occasioned by a 1,000-person layoff,

13 the Debtors come to this Court to restructure and repay their debts (many of which are the

14 direct consequence of unreimbursed medical expenses) pursuant to a plan of reorganization.

15 The Debtors seek relief under chapter 13 of the Bankruptcy Code, which "facilitate[s] the

16 adjustments of all types of debts . . . through extension and composition plans funded out of

17 future income, under the protection of the court."  8 COLLIER ON BANKRUPTCY ¶ 1300.02

18 (16th ed., rev. 2010).  *See also Perry v. Commerce Loan Co.*, 383 U.S. 392, 395 (1966)

19 (describing the predecessor of chapter 13: "[T]he wage-earner extension-of-time [chapter of

20 the Bankruptcy Act] was intended to give to the wage earner a reasonable opportunity to

21 arrange installment payments to be made out of his future earnings.  Congress clearly

22 intended to encourage wage earners to pay their debts in full, rather than to go into straight

23 bankruptcy . . . .").  The Debtors seek no free ride.  Rather, they ask only for the opportunity

24 to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life

---

25  [5]  The Supreme Court's description of the marital relation in *Griswold v. Connecticut*, 381 U.S.
26  479, 486 (1965), is far more applicable than anything cited in the Motion to Dismiss:  "Marriage
is a coming together for better or for worse, hopefully enduring, and intimate to the degree of
27  being sacred.  It is an association that promotes a way of life, not causes; a harmony in living, not
political faiths; a bilateral loyalty, not commercial or social projects.  Yet it is an association for
28  as noble a purpose as any involved in our prior decisions."

1     with a clear field for future effort, unhampered by the pressure and discouragement of

2     preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v.*

3     *Hunt*, 292 U.S. 234, 244 (1934)).    They seek, in other words, the "fresh start" that the

4     Bankruptcy Code offers the "honest but unfortunate debtor."    *Id*. at 286-87.    There is no

5     dispute that the Debtors qualify for such relief.

6         The Debtors filed jointly pursuant to section 302 of the Bankruptcy Code because,

7     like many families, they pool all of their income and expenses.    *See* Balas Decl. ¶ 3 ("We

8     view everything as belonging to (or owed by) us as a couple.    There is no 'his' and 'mine';

9     everything is 'ours.'"); Morales Decl. ¶ 3 (same).    Indeed, the Debtors are fully subject to

10    California's community property system, which vests in each spouse a "present, existing,

11    and equal" interest in all property acquired during marriage, CAL. FAM. CODE §§ 751 & 760,

12    and generally renders the marital community "liable for a debt incurred by either spouse

13    before or during marriage, regardless of which spouse has the management and control of the

14    property and regardless of whether one or both spouses are parties to the debt or to a

15    judgment for the debt," CAL. FAM. CODE § 910(a).    *See* Balas Decl. ¶ 3 ("All the property

16    that either of us owns is community property, and all of our debts are community debts.    We

17    have no prenuptial agreement, postnuptial agreement or transmutation agreement."); Morales

18    Decl. ¶ 3 (same).

19        A joint filing recognizes the reality of the Debtors' intertwined financial lives by

20    allowing for automatic and presumptive substantive consolidation of estates.    *See* LBR 1015-

21    1(a) ("A joint case commenced for spouses by the filing of a single petition under 11 U.S.C.

22    § 302(a) will be deemed substantively consolidated unless the court orders otherwise.").    It

23    also saves the expense of multiple filing fees and the motion practice that would otherwise

24    be required to achieve a comparable result.    2 COLLIER ON BANKRUPTCY ¶ 302.02[1][a]

25    (16th ed., rev. 2010); 28 U.S.C. § 1930.    No purpose would be served by forcing the Debtors

26    to pretend as though their financial lives are not inextricably intertwined.    Nor is it sufficient

27    to assert that the Debtors may be able to work around DOMA's irrational prohibition by

28    filing two separate cases and moving to substantively consolidate them.    As Chief Judge

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

Kozinski explained when rejecting an analogous proposed remedy for a gay federal employee who was improperly denied the same family insurance coverage available to heterosexual federal employees on account of DOMA:  "[T]here is an inherent inequality in allowing some employees to participate fully in the [Federal Employees Health Benefits Program], while giving others a wad of cash to go elsewhere.  Even if the destination is the same, it's still the back of the bus."  *Golinski II*, 587 F.3d at 960.  Here, too, the Debtors are entitled to the same rights as every other validly married couple in this District.

## III.

## JURISDICTION AND VENUE

This Court has jurisdiction over the Bankruptcy Case pursuant to 28 U.S.C. §§ 157 and 1334, and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion to Dismiss and Confirmation Objection are core matters under 28 U.S.C. §§ 157(b)(2)(A) & (L) that this Court may hear and determine pursuant to 28 U.S.C. § 157(b)(1).

## IV.

## DISMISSING THE BANKRUPTCY CASE ON THE GROUND THAT
## ONE OF THE DEBTORS IS NOT A "PERSON OF THE OPPOSITE SEX"
## IS UNCONSTITUTIONAL GENDER DISCRIMINATION

Distilled to its essence, the U.S. Trustee's motion asks the Court to dismiss this case because the "Debtors appear to be two males."  Yip Decl. ¶ 2.  If Gene Balas were "Gina Balas," or if Carlos Morales were "Carla Morales," there would be no question about the propriety of a joint bankruptcy filing.  Absent DOMA's explicit gender-based limitation, *see* 1 U.S.C. § 7 (mandating that "the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife"), nothing in the Bankruptcy Code would preclude the Debtors from filing jointly under section 302, which contains no gender-based distinctions:  "A joint case under a chapter of this title is commenced by the filing with the bankruptcy court of a single petition under such chapter by an individual that may be a debtor under such chapter and such individual's spouse."  11 U.S.C. § 302(a).

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1    Although discrimination on the basis of sexual orientation is not invariably "a subset

2    of, or subsumed within, discrimination on the basis of sex," *In re Marriage Cases*, 183 P.3d

3    384, 439 (Cal. 2008), it is nonetheless true that "[s]exual orientation discrimination can take

4    the form of sex discrimination." *Perry*, 704 F. Supp. 2d at 996; *accord Levenson I*, 560 F.3d

5    at 1147 ("Levenson was unable to make his spouse a beneficiary of his federal benefits due

6    solely to his spouse's sex.  If Sears were female, or if Levenson himself were female,

7    Levenson would be able to add Sears as a beneficiary.  Thus, the denial of benefits at issue

8    here was sex-based and can be understood as a violation of the [Judiciary's] prohibition of

9    sex discrimination."); *see also Golinski II*, 587 F.3d at 957 ("Karen Golinski has been denied

10    a benefit of employment because she married a woman rather than a man.  I previously

11    determined that violates this court's guarantee of equal employment opportunity.") (citing

12    *Golinski I*, 587 F.3d at 902 (characterizing claim as "denial of [a] benefit on account of sex

13    and sexual orientation")).  As applied in this particular case, where the sole factor allegedly

14    disqualifying the Debtors from a joint bankruptcy filing is the fact that one of them is not "a

15    person of the opposite sex," 1 U.S.C. § 7, DOMA is classic gender discrimination.

16    Barring a person from exercising a right solely on the ground that he or she is the

17    "wrong" gender has been recognized as unconstitutional since the Supreme Court's

18    unanimous decision in *Reed v. Reed*, 404 U.S. 71 (1971).  In that case, estranged spouses

19    Sally Reed and Cecil Reed each sought to be appointed administrator of the estate of their

20    deceased child.  *Id.* at 71-72.  Although both parents were equally qualified to serve, the

21    Idaho probate court appointed Cecil Reed on the sole basis that, under Idaho probate law,

22    "'of several persons claiming and equally entitled to administer, males must be preferred to

23    females.'"  *Id.* at 73 (quoting the Idaho statute).  The Supreme Court unanimously struck

24    down this law as a violation of the equal protection clause:  "[T]he arbitrary preference

25    established in favor of males by . . . the Idaho Code cannot stand in the face of the

26    Fourteenth Amendment's command that no State deny the equal protection of the laws to

27    any person within its jurisdiction."  *Id.* at 74.

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1    *Reed* is the first in what by now is a long line of Supreme Court cases striking down

2    state and federal statutes that discriminate on the basis of gender.[6]  Two subsequent cases

3    applying *Reed* are particularly important here.  In *Orr v. Orr*, 440 U.S. 268 (1979), the

4    Supreme Court applied *Reed* to invalidate an Alabama law that disadvantaged men (by

5    providing that husbands, but not wives, may be required to pay alimony upon divorce) rather

6    than women (as the Idaho law in *Reed* preferred male candidates for probate administrators).

7    *See id*. at 278-79 ("In authorizing the imposition of alimony obligations on husbands, but not

8    on wives, the Alabama statutory scheme provides that different treatment be accorded on the

9    basis of sex; it thus establishes a classification subject to scrutiny under the Equal Protection

10   Clause.  The fact that the classification expressly discriminates against men, rather than

11   women, does not protect it from scrutiny.").  Under *Orr*, the fact that DOMA discriminates

12   against Gene Balas for not being "Gina" (rather than vice versa) or against Carlos Morales

13   for not being "Carla" (rather than vice versa) does not immunize it from scrutiny for

14   unconstitutional gender bias.

15       The Supreme Court's decision in *Califano v. Westcott*, 443 U.S. 76 (1979), is also

16   relevant here.  *Westcott* concerned a federal program that provided benefits to "families

17   whose dependent children have been deprived of parental support because of the

18   

---

[6]    *E.g.*, *VMI*, 518 U.S. 515 (invalidating men-only admission policy of state-supported
university); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982) (invalidating
women-only admission policy of state-supported university); *Kirchberg v. Feenstra*, 450
U.S. 455 (1981) (invalidating Louisiana law that made husbands "head and master" of
property jointly owned with their wives); *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142
(1980) (invalidating Missouri law that denied widowers, but not widows, benefits absent
mental or physical incapacity or dependency); *Caban v. Mohammed*, 441 U.S. 380 (1979)
(invalidating New York statute that permitted an unwed mother, but not an unwed father, to
withhold consent to an adoption); *Califano v. Goldfarb*, 430 U.S. 199 (1977) (invalidating
federal law under which survivors benefits were payable to widows regardless of
dependency, but were paid to widowers only on a showing of dependency); *Craig v. Boren*,
429 U.S. 190 (1976) (invalidating Oklahoma statute that prohibited the sale of certain
alcoholic beverages to men under age 21 and women under age 18); *Stanton v. Stanton*, 421
U.S. 7 (1975) (invalidating Utah statute under which girls attained majority at 18 but boys
did not attain majority until age 21); *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975)
(invalidating federal statute under which survivor's benefits differed based on whether the
worker was male or female); *Taylor v. Louisiana*, 419 U.S. 522 (1975) (invalidating state
law automatically exempting women from jury service); *Frontiero v. Richardson*, 411 U.S.
677 (1973) (plurality) (invalidating federal statute under which spouses of male members of
the uniformed services were deemed dependents but spouses of female members had to
prove actual dependency).

11

unemployment of the father, but [not] when the mother becomes unemployed." *Id*. at 78. The government defended the law on the basis that its application to families (rather than individuals) necessarily meant that it did not amount to gender discrimination:

> The Secretary readily concedes that [the statute] entails a gender distinction. He submits, however, that the Act does not award AFDC benefits to a father where it denies them to a mother. ***Rather, the grant or denial of aid based on the father's unemployment necessarily affects, to an equal degree, one man, one woman, and one or more children***. As the Secretary puts it, even if the statute is "gender-based," it is not "gender-biased."

*Id*. at 83-84 (emphasis added). A similar assertion here might be that applying DOMA to dismiss the Debtors' Bankruptcy Case is not gender discrimination because the statute is directed at non-recognition of the Debtors as a married couple, and not specifically at one of the spouses. The Supreme Court rejected that rationalization in *Westcott*:

> We are not persuaded by this analysis. For mothers who are the primary providers for their families, and who are unemployed, [the law] is obviously gender biased, for it deprives them and their families of benefits solely on the basis of their sex. The Secretary's argument, at bottom, turns on the fact that the impact of the gender qualification is felt by family units rather than individuals. But this Court has not hesitated to strike down gender classifications that result in benefits being granted or denied to family units on the basis of the sex of the qualifying parent. [Citations.] Here, as in those cases, the statute discriminates against one particular category of family – that in which the female spouse is a wage earner.

*Id*. at 84 (internal quotation marks omitted). Here, too, the fact that DOMA's gender qualification is felt by the Debtors as a family unit (that is, as two married men) does not make DOMA any less subject to equal protection scrutiny. Like the statute in *Westcott*, DOMA "discriminates against one particular category of family" (same-gender couples), and as applied to either Debtor, the law "is obviously gender-biased [because] it deprives [that particular Debtor] of benefits solely on the basis of [his] sex." *Id*.

Inasmuch as DOMA unquestionably draws distinctions on the basis of gender, the statute is constitutionally infirm absent affirmative proof by the U.S. Trustee of an "exceedingly persuasive justification" for DOMA's gender-based distinctions. *VMI*, 518 U.S. at 531 ("Parties who seek to defend gender-based government action must demonstrate

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1  an 'exceedingly persuasive justification' for that action."). Critically, "[t]he justification

2  must be genuine, not hypothesized or invented *post hoc* in response to litigation," *id.* at 533,

3  which means – as the Holder Letter recognizes – that "the United States can defend [DOMA]

4  only by invoking Congress' actual justifications for the law." Holder Letter [Tab A] at 4.

5  Because those actual justifications do not even touch on the invidious gender discrimination

6  effected by DOMA, this law is unlike any of the (rare) enactments upheld by the Supreme

7  Court as permissible gender discrimination.[7] Rather, like the law at issue in *Romer* (which

8  was subject only to rational basis scrutiny), DOMA's gender discriminatory effect "fails,

9  indeed defies, . . . conventional inquiry," 517 U.S. at 632. Nothing about the Debtors'

10 gender has even the slightest connection to their fitness to file a joint bankruptcy petition.

11 Indeed, nowhere on the official bankruptcy forms are debtors required or even requested to

12 indicate their gender. *Cf.* Yip Decl. ¶ 2 (stating for the apparent purpose of establishing an

13 otherwise absent record that "Debtors appear to be two males"). In short, there is no

14 question that DOMA's effect here is "sex-based," *Levenson I*, 560 F.3d at 1147, and there is

15 no legally defensible justification for such effect. Thus, the statute is both "gender-based"

16 and "gender-biased," *Westcott*, 443 U.S. at 83-84, and it cannot constitutionally be applied to

17 require the dismissal of the Debtors' joint Bankruptcy Case.

---

[7]  In *Nguyen v. INS*, 533 U.S. 53 (2001), for example, the Supreme Court rejected a constitutional
challenge to an immigration statute that imposes more stringent proof requirements when a child
claims citizenship through a father instead of a mother. The Court reasoned that "[f]athers and
mothers are not similarly situated with regard to the proof of biological parenthood." *Id.* at 63.
"In the case of the mother, the relation is verifiable from the birth itself. The mother's status is
documented in most instances by the birth certificate or hospital records and the witnesses who
attest to her having given birth. In the case of the father, the uncontestable fact is that he need
not be present at the birth. If he is present, furthermore, that circumstance is not incontrovertible
proof of fatherhood." *Id.* at 62. The distinction drawn in *Nguyen*, therefore, was rooted in a
concrete biological difference between men and women that the Supreme Court viewed as
substantially related to an important governmental interest.

13

1

**V.**

2    **TREATING THE DEBTORS' MARRIAGE AS UNWORTHY OF**

3    **FEDERAL RECOGNITION ALSO CONSTITUTES UNLAWFUL**

4    **DISCRIMINATION ON THE BASIS OF SEXUAL ORIENTATION**

5         As the President, the Attorney General, and every court that has squarely addressed

6    the issue has recognized, DOMA's attempt to disfavor certain valid marriages unlawfully

7    deprives the parties to those unions of the equal protection of the law.  Holder Letter [Tab A]

8    at 1; *Levenson I*, 560 F.3d at 1151; *Levenson II*, 587 F.3d at 931; *Dragovich*, slip op. [Tab D]

9    at 25; *Gill*, 699 F. Supp. 2d at 397.  Reaching that conclusion does *not* require deciding

10   whether gays and lesbians have a constitutional right to marry.  *Cf. Perry*, 704 F. Supp. 2d

11   921.  Instead, the issue is whether under the constitution legally married couples who are

12   heterosexual may be granted more rights than legally married couples who are gay.  They

13   may not.  Under the constitution, the Debtors are in precisely the same position as any of the

14   countless heterosexual married couples who file joint bankruptcy petitions each day in courts

15   around the country.  Being "similarly circumstanced," they are entitled to "be treated alike."

16   *F.S. Royster*, 253 U.S. at 415; *accord Nordlinger*, 505 U.S. at 10.[8]

17        The unconstitutionality of section 3 of DOMA is not a close question.  If DOMA

18   purported to deny federal recognition of any otherwise valid marriage on the ground that the

19   union was solemnized on a particular day of the week (say, Tuesday), or because the

20

21   [8]   Because DOMA is a federal law, the Debtors' constitutional challenge arises under the due
process clause of the Fifth Amendment (which binds the national government) rather than any

22   portion of the Fourteenth Amendment (which applies by its terms only to the states).  *See Bolling
v. Sharpe*, 347 U.S. 497, 499 (1954).  Nevertheless, the Fifth Amendment's due process clause

23   includes an equal protection component that mirrors the protections of the Fourteenth
Amendment.  *Id.*; *Davis v. Passman*, 442 U.S. 228, 234 (1979).  It should also be noted that the

24   absence of a "constitutional right to obtain a discharge of one's debts in bankruptcy," *United
States v. Kras*, 409 U.S. 434, 446 (1973), is no barrier to the Debtors' challenge to DOMA

25   because the "opportunity [to seek bankruptcy relief], where the [government] has undertaken to
provide it, . . . must be made available to all on equal terms."  *Plyler v. Doe*, 457 U.S. 202, 223

26   (1982); *cf. Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (although "a State is not required by the
Federal Constitution to provide appellate courts or a right to appellate review at all," "that is not

27   to say that a State that does grant appellate review can do so in a way that discriminates against
some convicted defendants on account of their poverty").

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1   celebrants had a particular physical attribute (perhaps red hair), there would be no doubt that

2   the law is arbitrary, irrational and unconstitutional.  *E.g.*, *Village of Willowbrook v. Olech*,

3   528 U.S. 562, 564-65 (2000) (equal protection clause is violated where government acts in

4   an "irrational and wholly arbitrary" manner, even if the actions impact only a "class of one"

5   rather than a traditionally protected group); *Colgate v. Harvey*, 296 U.S. 404, 425-26 (1935)

6   (hypothesizing the absurdity – and hence the unconstitutionality – of a statute that levied "a

7   tax upon all income from loans except those made on Mondays"), *overruled on other*

8   *grounds by Madden v. Kentucky*, 309 U.S. 83 (1940); *Barsky v. Board of Regents*, 347 U.S.

9   442, 470 (1954) (Frankfurter, J., dissenting) (governmental authority may never be premised

10  "on arbitrary, whimsical or irrational considerations"; "A license cannot be revoked because

11  a man is redheaded or because he was divorced, except for a calling, if such there be, for

12  which redheadedness or an unbroken marriage may have some rational bearing.").

13          It is just as arbitrary and irrational to deny recognition of a valid marriage on the

14  ground that the parties to the union are gay as it would be to deny recognition because the

15  marriage was solemnized on a Tuesday.   Governmental actions that "treat individuals

16  differently on the basis of their sexual orientation violate the constitutional guarantee of

17  equal protection."  *Flores v. Morgan Hill Unified School Dist.*, 324 F.3d 1130, 1137 (9th Cir.

18  2003).   The fact that the Debtors are gay is, as Justice Jackson said of indigence, "a neutral

19  fact – constitutionally an irrelevance, like race, creed, or color" that "cannot be used . . . to

20  test, qualify, or limit [their] rights as [citizens] of the United States."  *Edwards v. California*,

21  314 U.S. 160, 184-85 (1941) (concurring opinion).  The Supreme Court's recent decision in

22  *Christian Legal Society v. Martinez*, 130 S. Ct. 2971 (2010), rejects the tired canard that

23  discriminating against gay and lesbian individuals is merely discrimination on the basis of

24  "conduct":  "Our decisions have declined to distinguish between status and conduct in this

25  context."  *Id.* at 2990 (citing, *inter alia*, *Lawrence v. Texas*, 539 U.S. 558, 583 (2003)

26  (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to

27  conduct, the conduct targeted by this law is conduct that is closely correlated with being

28  homosexual.   Under such circumstances, the law is targeted at more than conduct.   It is

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1    instead directed toward gay persons as a class."); *Bray v. Alexandria Women's Health Clinic*,

2    506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.")).

### A.    Classifications Based On Sexual Orientation Warrant Heightened Scrutiny

5    The first question presented when addressing an equal protection challenge is the

6    level of constitutional scrutiny applicable.  Although there is only a single equal protection

7    clause, the Supreme Court has developed a tiered system of review under which some

8    classifications (such as those based on race or gender) are automatically deemed suspect and

9    are subject to particularly searching examination.  *See generally United States v. Carolene

10   Prods. Co.*, 304 U.S. 144, 152 n.4 (1938); Gerald Gunther, *In Search Of Evolving Doctrine

11   On A Changing Court: A Model For A Newer Equal Protection*, 86 HARV. L. REV. 1 (1972).

12   As the Holder Letter cogently demonstrates, "classifications based on sexual orientation

13   warrant heightened scrutiny," Holder Letter [Tab A] at 2, which is necessarily fatal to

14   DOMA because "the legislative record underlying [the statute's] passage" in 1996

15   indefensibly reflects "precisely the kind of stereotype-based thinking and animus the Equal

16   Protection Clause is designed to guard against," *id.* at 4-5 (collecting examples).  *See also

17   Witt v. Dep't of Air Force*, 527 F.3d 806 (9th Cir. 2008) (applying heightened scrutiny to a

18   claim of sexual orientation discrimination advanced under the due process clause).[9]

19   Neither the Supreme Court nor the Ninth Circuit has settled the appropriate level of

20   scrutiny for sexual orientation classifications.  The Supreme Court reviewed a sexual

---

[9]    As noted above, *see supra* note 8, the Debtors' challenge to DOMA's application in this case is based on the due process clause of the Fifth Amendment, which has been held to contain an equal protection component.  The Debtors claim the benefit of the entirety of the clause, however, and do not limit their argument to a strict equal protection analysis.  *See generally McDonald v. City of Chicago*, 130 S. Ct. 3020, 3090-93, 3101 (2010) (Stevens, J., dissenting) (describing the office of the due process clause in safeguarding fundamental rights, and noting that "[g]overnment action that . . . pointlessly infringes settled expectations, trespasses into sensitive private realms or life choices without adequate justification, perpetrates gross injustice, or simply lacks a rational basis will always be vulnerable to judicial invalidation" under the due process clause); *see also Dragovich*, slip op. [Tab D] at 28 (where plaintiffs "sufficiently stated a claim that [section 3 of DOMA] do[es] not bear a rational relationship to a legitimate governmental interest," plaintiffs thereby also "stated a cognizable claim for violation of their rights to substantive due process").

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

orientation classification in *Romer*, but it declined to decide whether the classification requires heightened scrutiny because, it found, the challenged law "fail[ed], indeed defie[d], even" rational basis review. 517 U.S. at 632. The Ninth Circuit once applied heightened scrutiny to classifications based on sexual orientation, *see Hathaway v. Sec'y of the Army*, 641 F.2d 1376, 1382 (9th Cir. 1981); *see also Beller v. Middendorf*, 632 F.2d 788, 809-10 (9th Cir. 1980) (Kennedy, J.), but reversed course and applied rational basis review in *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990), primarily on the authority of *Bowers v. Hardwick*, 478 U.S. 186 (1986). *Bowers*, of course, has been repudiated by the Supreme Court. *See Lawrence*, 539 U.S. at 578 ("*Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers v. Hardwick* should be and now is overruled."); *see also id.* at 575 (holding that *Bowers*' "continuance as precedent demeans the lives of homosexual persons").

It is therefore an open question in the Ninth Circuit what level of scrutiny applies to classifications based on sexual orientation. *Witt*, 527 F.3d at 824 (Canby, J., concurring in part and dissenting in part) ("[T]he overruling of *Bowers* by *Lawrence* has undermined *High Tech Gays*. We accordingly are free to revisit the question whether the adverse classification of homosexuals is 'suspect' under equal protection analysis."). *See also Levenson I*, 560 F.3d at 1149 (observing that it is "likely that some form of heightened constitutional scrutiny applies to Levenson's claims," but declining to resolve the issue definitively because "the denial of benefits here cannot survive even rational basis review, the least searching form of constitutional scrutiny"); *Golinski I*, 587 F.3d at 904 (noting the Ninth Circuit's application of heightened scrutiny in *Witt*); *Dragovich*, slip op. [Tab D] at 21 (declining to decide "whether Plaintiffs are members of a protected class," inasmuch as DOMA fails even rational basis review).

This Court should apply heightened scrutiny to DOMA. As the Executive Branch now recognizes (and as the Ninth Circuit once recognized in *Hathaway* and *Beller*, prior to the now-repudiated decision in *Bowers*), each of the factors traditionally examined by courts

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

17

1   when deciding whether to apply heightened scrutiny are present with respect to gays and

2   lesbians. The Holder Letter persuasively outlines the Executive Branch's rationale. *See*

3   Holder Letter [Tab A] at 2-4. Four factors are important:

4   • "[W]hether the group in question has suffered a history of discrimination";

5   • "[W]hether individuals exhibit obvious, immutable, or distinguishing

6       characteristics that define them as a discrete group";

7   • "[W]hether the group is a minority or is politically powerless"; and

8   • "[W]hether the characteristics distinguishing the group have little relation to

9       legitimate policy objectives or to an individual's ability to perform or

10      contribute to society."

11  *Id.* at 2 (citing *Bowen v. Gilliard*, 483 U.S. 587, 602-03 (1987); *City of Cleburne v. Cleburne*

12  *Living Ctr.*, 473 U.S. 432, 441-42 (1985)) (internal quotation marks omitted). "Each of these

13  factors counsels in favor of being suspicious of classifications based on sexual orientation."

14  *Id.*; *accord Perry*, 704 F. Supp. 2d at 997 (concluding, after trial, that "gays and lesbians are

15  the type of minority strict scrutiny was designed to protect"; "All classifications based on

16  sexual orientation appear suspect, as the evidence shows that California would rarely, if ever,

17  have a reason to categorize individuals based on their sexual orientation.").

18        1.    <u>Lesbians and Gay Men Have Experienced a History of Discrimination</u>

19        "[T]here is, regrettably, a significant history of purposeful discrimination against gay

20  and lesbian people, by governmental as well as private entities, based on prejudice and

21  stereotypes that continue to have ramifications today." Holder Letter [Tab A] at 2. *See, e.g.*,

22  *Perry*, 704 F. Supp. 2d at 981-82 (collecting evidence of hundreds of hate crimes each year

23  in California alone motivated by sexual orientation bias). It is beyond reasonable dispute

24  that "for centuries there have been powerful voices to condemn homosexual conduct as

25  immoral," and that "state-sponsored condemnation" of homosexuality has led to

26  "discrimination both in the public and in the private spheres." *Lawrence*, 539 U.S. at 571,

27  575-76; *accord Witt*, 527 F.3d at 824-25 (Canby, J., concurring in part and dissenting in part)

28  ("[H]omosexuals have experienced a history of purposeful unequal treatment and been

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1  subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative

2  of their abilities.") (internal quotation marks omitted).   The Ninth Circuit stated more than

3  twenty years ago that "homosexuals have suffered a history of discrimination," *High Tech*

4  *Gays*, 895 F.2d at 573, and the Circuit reiterated that observation in *Perry v. Proposition 8*

5  *Official Proponents*, 587 F.3d 947, 954 (9th Cir. 2009).   This history alone suggests that

6  legal classifications based on sexual orientation are especially likely to reflect bias and are

7  unlikely to be based on the pursuit of legitimate objectives.   *See Plyler v. Doe*, 457 U.S. 202,

8  217-18 n.14 (1982).

9  2.   <u>Sexual Orientation Is a Defining and Immutable Characteristic</u>

10  "[W]hile sexual orientation carries no visible badge, a growing scientific consensus

11  accepts that sexual orientation is a characteristic that is immutable; it is undoubtedly unfair to

12  require sexual orientation to be hidden from view to avoid discrimination."   Holder Letter

13  [Tab A] at 3 (citations omitted).   The Executive Branch's conclusion in this regard accords

14  with well-settled Ninth Circuit precedent:

15  Sexual orientation and sexual identity are immutable; they are so fundamental
16  to one's identity that a person should not be required to abandon them.   Many
   social and behavioral scientists generally believe that sexual orientation is set
17  in place at an early age.   The American Psychological Association has
   condemned as unethical the attempted "conversion" of gays and lesbians.
18  Further, the American Psychiatric Association and the American Psychological
19  Association have removed "homosexuality" from their lists of mental
   disorders.

20

21  *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093-94 (9th Cir. 2000) (citations omitted),

22  *overruled in part on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005).

23  *See also Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005).   Judge Walker likewise

24  concluded after trial in *Perry* that "[n]o credible evidence supports a finding that an

25  individual may, through conscious decision, therapeutic intervention or any other method,

26  change his or her sexual orientation."   704 F. Supp. 2d at 964.   This case law accords with

27  the Debtors' own personal experience.   Balas Decl. ¶ 5 ("It is an innate part of me – just as I

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1  am right handed – and it is something that cannot be changed, nor was it a 'choice.'");

2  Morales Decl. ¶¶ 5-7.

3         3.     <u>Lesbians and Gay Men Face Significant Political Obstacles</u>

4      "[T]he adoption of laws like those at issue in [*Romer*] and *Lawrence*, the longstanding

5  ban on gays and lesbians in the military, and the absence of federal protection for

6  employment discrimination on the basis of sexual orientation show [that gays and lesbians as

7  a group] have limited political power and ability to attract the favorable attention of the

8  lawmakers."  Holder Letter [Tab A] at 3 (internal quotation marks omitted).  Voters (through

9  ballot measures) as well as lawmakers repeatedly have passed measures denying lesbians and

10  gay men protections against discrimination.  *See, e.g.*, *Strauss*, 207 P.3d 48 (upholding

11  Proposition 8 against state constitutional challenge); *Lofton v. Sec'y of Dep't of Children &*

12  *Family Servs*, 358 F.3d 804 (11th Cir. 2004) (upholding Florida statute that bars lesbian and

13  gay couples from adopting); *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir.

14  2006) (upholding Nebraska ballot measure that strips same-sex couples of all legal

15  protections akin to marriage, civil union, or domestic partnership).

16      The fact that lesbians and gay men may have achieved sporadic successes in

17  combating discrimination does not obviate the significant, ongoing obstacles they confront.

18  Negative stereotypes, for example, "inhibit political compromise with other groups: 'It's

19  very difficult to engage in the give-and-take of the legislative process when I think you are

20  an inherently bad person.  That's just not the basis for compromise and negotiation in the

21  political process.'"  *Perry*, 704 F. Supp. 2d at 937 (quoting political scientist Gary Segura,

22  whose expert testimony at trial was credited by the court).  In other words, the question is not

23  whether a group has achieved ***any*** successes, but rather its relative political power and

24  whether substantial obstacles persist to the group's ability to achieve redress through

25  democratic means.  Classifications based on gender, for example, warrant heightened

26  scrutiny despite the fact that "the position of women in America has improved markedly in

27  recent decades"; key protective legislation had been enacted; and "women do not constitute a

28  small and powerless minority."  *Frontiero*, 411 U.S. at 685-86 & n.17.  Similarly,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1 discrimination based on race is subject to strict scrutiny notwithstanding undeniable progress

2 in race relations – including the election of the nation's first black President.  *See, e.g.*,

3 *Perry*, 704 F. Supp. 2d at 943 (crediting expert testimony that "gays and lesbians possess less

4 power than groups [traditionally] granted judicial protection").

5     4.   Sexual Orientation Is Unrelated to the Ability to Contribute to Society

6     "Finally, there is a growing acknowledgment that sexual orientation 'bears no relation

7 to ability to perform or contribute to society.'"    Holder Letter [Tab A] at 3 (quoting

8 *Frontiero*, 411 U.S. at 686).  Rather than resting on "meaningful considerations," *Cleburne*,

9 473 U.S. at 441, laws that discriminate based on sexual orientation, like laws that

10 discriminate based on race, national origin or sex, target a characteristic that "bears no

11 relation to ability to perform or contribute to society." *Id.*  "[B]y every available metric . . .

12 as partners, parents and citizens, opposite-sex couples and same-sex couples are equal."

13 *Perry*, 704 F. Supp. 2d at 1002.  *See also Watkins v. U.S. Army*, 875 F.2d 699, 725 (9th Cir.

14 1989) (*en banc*) (Norris, J., concurring in the judgment) ("Sexual orientation plainly has no

15 relevance to a person's ability to perform or contribute to society.") (internal quotation marks

16 omitted).

17     \*   \*   \*

18     The Holder Letter persuasively demonstrates that legal classifications based on sexual

19 orientation should be viewed with particular skepticism, given the four factors the Supreme

20 Court has identified as relevant to the application of heightened scrutiny.  In addition, the

21 Ninth Circuit ruled in *Witt* that "when the government attempts to intrude upon the personal

22 and private lives of homosexuals, in a manner that implicates the rights identified in

23 *Lawrence*," the law is subject to heightened scrutiny.  527 F.3d at 819.  DOMA's preclusion

24 of equal treatment, in both purpose and effect, seeks to demean the Debtors' marriage, and as

25 such, impinges on the "liberty protected by the Constitution" identified in *Lawrence*, which

26 held that "adults may choose to enter upon [same-gender relationships] and still retain their

27 dignity as free persons."  539 U.S. at 567.  DOMA's purpose and effect is to erase lawful

28 marriages between persons of the same gender from federal recognition for all purposes,

thereby implicating approximately 1,138 federal laws that tie benefits, protections, rights, or responsibilities to married status. *See Gill*, 699 F. Supp. 2d at 379. DOMA is inconsistent with the protections for individual dignity and respect for private lives that *Lawrence* guarantees to lesbians and gay men, as to others. *Lawrence*, 539 U.S. at 567-68. *Witt* provides still another reason for subjecting DOMA to heightened scrutiny.

## B.    DOMA Cannot Withstand Heightened Scrutiny

As the Holder Letter properly concludes, heightened scrutiny is fatal to DOMA. Holder Letter [Tab A] at 5. "Under heightened scrutiny, 'a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded.'" *Id*. at 4 (quoting *VMI*, 518 U.S. at 535-36). "In other words, under heightened scrutiny, the United States cannot defend [DOMA] by advancing hypothetical rationales, independent of the legislative record"; rather, the government is limited to "invoking Congress' actual justifications for the law." *Id*. The Holder Letter forthrightly acknowledges that those actual justifications are indefensible. *Id*. at 4-5 & n.7 (demonstrating that the legislative record underlying DOMA is filled with "precisely the kind of stereotype-based thinking and animus the Equal Protection Clause is designed to guard against") (citing *Cleburne*, 473 U.S. at 448 ("mere negative attitudes, or fear" are not permissible bases for discriminatory treatment); *Romer*, 517 U.S. at 635 (rejecting rationale that law was supported by "the liberties of landlords or employers who have personal or religious objections to homosexuality"); *Palmore v. Sidotti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.")); *accord Dragovich*, slip op. [Tab D] at 25 ("The animus toward, and moral rejection of, homosexuality and same-sex relationships are apparent in the Congressional Record.").[10]

_____

[10]  The asserted justifications underlying DOMA are addressed in detail below. As every court to have squarely confronted the issue has ruled, the supposed governmental interests offered for DOMA fail even the lowest level of constitutional scrutiny (rational basis), and thus necessarily cannot meet a heightened standard. *Levenson I*, 560 F.3d at 1149-51; *Levenson II*, 587 F.3d at 931-33; *Dragovich*, slip op. [Tab D] at 25; *Gill*, 699 F. Supp. 2d at 397.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1    In addition to a close examination of the actual motivations and justifications for

2    DOMA (rather than merely imagining hypothetical rationales), heightened scrutiny is

3    distinct from rational basis review insofar as the "analysis is as-applied rather than facial."

4    *Witt*, 527 F.3d at 819.  Thus, when the Ninth Circuit in *Witt* applied heightened scrutiny to

5    the "Don't Ask, Don't Tell" law that discriminated against gay and lesbian members of the

6    armed services, the court refused the government's invitation to limit its inquiry to whether

7    the military's policy "has some hypothetical, post-hoc rationalization in general," such as

8    "unit cohesion" or "troop morale."  *Id*.  Instead, the Ninth Circuit's heightened scrutiny

9    review required the government to demonstrate that "a justification exists for the application

10   of the policy ***as applied to Major Witt***."  *Id*. (emphasis added).  *See Golinski I*, 587 F.3d at

11   904 (describing the holding in *Witt* as requiring the military's policy "to survive heightened

12   scrutiny as applied to each service member discharged").  The case was remanded to the

13   district court for a trial on whether application of Don't Ask, Don't Tell "specifically to

14   Major Witt significantly furthers the government's interest and whether less intrusive means

15   would achieve substantially the government's interest."  *Witt*, 527 F.3d at 821.[11]

16   As in *Witt*, applying heightened scrutiny in this case means that the requisite "analysis

17   is as-applied rather than facial."  *Id*. at 819.  The question is not whether "there is any

18   reasonably conceivable state of facts that could provide a rational basis" for DOMA, *FCC v.*

19   *Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), or whether "the legislative facts on which

20   the classification is apparently based could . . . reasonably be conceived to be true by the

21   governmental decisionmaker," *Vance v. Bradley*, 440 U.S. 93, 111 (1979).  Rather, the Court

22   must determine whether dismissing the Debtors' particular Bankruptcy Case pursuant to

23   DOMA "advances an important governmental interest."  *Witt*, 527 F.3d at 821.  It does not.

---

24

[11]    After a full trial on the merits, the district court held that "the suspension and discharge of
25      Margaret Witt did not significantly further the important government interest in advancing unit
26      morale and cohesion," and ordered Major Witt reinstated.  *Witt v. Dep't of Air Force*, 739 F.
        Supp. 2d 1308, 1315-17 (W.D. Wash. 2010) ("The evidence before the Court is that Major
27      Margaret Witt was an exemplary officer.  She was an effective leader, a caring mentor, a skilled
28      clinician, and an integral member of an effective team.  Her loss within the squadron resulted in
        a diminution of the unit's ability to carry out its mission.  Good flight nurses are hard to find.").

1    There is no possible governmental interest to be advanced by dismissing this Bankruptcy

2    Case.  No creditor has objected.  The Debtors are lawfully married and otherwise (but for

3    DOMA) fully qualified to be joint debtors pursuant to section 302 of the Bankruptcy Code.

4    Dismissal of the Bankruptcy Case will not:

5          • "[E]ncourage[e] responsible procreation and child-bearing" (the Debtors have

6             no children, and even if they did, a joint bankruptcy filing would not hurt

7             them);

8          • "[D]efend[] [or] nurture[e] the institution of traditional heterosexual marriage"

9             (the Debtors are already married to each other, and allowing them to proceed

10            jointly in this Bankruptcy Case will not have the slightest effect on anyone

11            else's marriage);

12         • "[D]efend[] traditional notions of morality" (the Debtors' joint bankruptcy

13            filing is in no sense an affront to morality, traditional or otherwise); or

14         • "[P]reserve[e] scarce resources" (no governmental resources are implicated by

15            the Debtors' Bankruptcy Case, other than perhaps the resources brought to bear

16            in seeking dismissal of the case).

17    *Gill*, 699 F. Supp. 2d at 388 (setting out the reasons Congress offered for passing DOMA).

18         **C.**    **DOMA Lacks Even A Rational Basis**

19    Even if the Court were to apply rational basis review rather than heightened scrutiny,

20    DOMA must still be found unconstitutional – as every court to have squarely considered the

21    issue has held.  *Levenson I*, 560 F.3d at 1151; *Levenson II*, 587 F.3d at 931; *Dragovich*, slip

22    op. [Tab D] at 25; *Gill*, 699 F. Supp. 2d at 397.  "If the constitutional conception of equal

23    protection of the laws means anything, it must at the very least mean that a bare desire to

24    harm a politically unpopular group cannot constitute a legitimate governmental interest."

25    *Romer*, 517 U.S. at 634-35 (internal quotation marks omitted) (striking down under rational

26    basis review a law that, like DOMA does here, singled out gays and lesbians "for disfavored

27    legal status or general hardships"); *accord Lawrence*, 539 U.S. at 583 (O'Connor, J.,

28    concurring in the judgment) ("Moral disapproval of a group cannot be a legitimate

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

24

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1  governmental interest under the Equal Protection Clause because legal classifications must

2  not be drawn for the purpose of disadvantaging the group burdened by the law."); *Golinski I*,

3  587 F.3d at 903 ("[D]isapproval of homosexuality itself isn't a proper legislative end.").

4      Rational basis scrutiny requires that classifications be "rationally related to a

5  legitimate government purpose." *Cleburne*, 473 U.S. at 446; *United States Dep't of Agric. v.*

6  *Moreno*, 413 U.S. 528, 533 (1973).   Under rational basis review, courts must examine

7  whether disadvantages are imposed arbitrarily or for improper reasons. *Romer*, 517 U.S. at

8  634-35 (striking down measure based on "bare desire to harm" lesbian and gay persons).

9  This is precisely what DOMA does.  In *Gill*, Judge Tauro found DOMA unconstitutional

10  because, after examining the interests advanced by the government and the evidence

11  submitted by both sides, he was "convinced that 'there exists no fairly conceivable set of

12  facts that could ground a rational relationship' between DOMA and a legitimate government

13  objective." 699 F. Supp. 2d at 387.  Judge Wilken similarly concluded that "neither [the

14  government's] current justification, nor the actual contemporaneous reasons, for the

15  exclusion of same-sex couples for the federal definition of marriage can be found as a matter

16  of law to be rationally based on a legitimate governmental interest." *Dragovich*, slip op.

17  [Tab D] at 25.  This Court should reach the same conclusion.

18      1.   Rational Basis Review Is Not Toothless

19      Although rational basis review "is not a license for courts to judge the wisdom,

20  fairness, or logic of legislative choices," *Beach Commc'ns*, 508 U.S. at 313, the standard of

21  review "is not a toothless one," *Matthews v. De Castro*, 429 U.S. 181, 185 (1976).  The

22  government interest claimed to be furthered by discriminating against a particular group

23  must still be "legitimate," meaning not only that it must be a proper basis for government

24  action, but also that it must be "properly cognizable" by the governmental body at issue,

25  *Cleburne*, 473 U.S. at 448, and "relevant to interests" the classifying body "has the authority

26  to implement," *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001).  This

27  ensures that the interest supposedly advanced is within the purview of those making the

28  classification. *See, e.g.*, *Plyler*, 457 U.S. at 225 (overturning state law discriminating against

25

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1   immigrants and noting that although it is a "routine and normally legitimate part of the

2   business of the Federal Government to classify on the basis of alien status . . . only rarely are

3   such matters relevant to legislation by a State") (internal citation omitted); *see also Hampton*

4   *v. Mow Sun Wong*, 426 U.S. 88, 114-15 (1976) (Civil Service Commission could not justify

5   rule barring employment of aliens because asserted interests in encouraging nationalization

6   were "not matters which are properly the business of the Commission").  This concern is

7   particularly acute here, where the federal government has legislated in an area traditionally a

8   matter of state concern.[12]

9        In addition, the classification must be "narrow enough in scope and grounded in

10  sufficient factual context . . . to ascertain some relation between the classification and the

11  purpose it serve[s]."  *Romer*, 517 U.S. at 632-33.  The classification drawn "must find some

12  footing in the realities of the subject addressed by the legislation," *Heller v. Doe*, 509 U.S.

13  312, 321 (1993), and the government "may not rely on a classification whose relationship to

14  an asserted goal is so attenuated as to render the distinction arbitrary or irrational," *Cleburne*,

15  473 U.S. at 446; *Garrett*, 531 U.S. at 366 n.4 (no rational basis where the "purported

16  justifications . . . ma[k]e no sense in light of how the [government] treated other groups

17  similarly situated in relevant respects").  As the Supreme Court made clear in *Romer*,

18  rational basis review invalidates a measure whose "sheer breadth" is "discontinuous with the

19  reasons offered for it . . . ."  517 U.S. at 632.

20       Moreover, the requirement of a reasonably conceivable state of facts, *Vance*, 440 U.S.

21  at 111, demands that any claimed factual basis for a categorization be plausible.  *Romer*, 517

22

---

23  [12] "[T]he Constitution delegated no authority to the Government of the United States on the subject
    of marriage and divorce."  *Haddock v. Haddock*, 201 U.S. 562, 575 (1906).  Given the centuries-

24  long American tradition of federal deference to state regulation of marital relations, DOMA's
    spiteful prohibition on recognizing the Debtors' lawful marriage is inconsistent with "'the

25  division of authority between federal and state governments,'''  *Massachusetts v. Dep't of Health
    & Human Servs.*, 698 F. Supp. 2d 234, 246 (D. Mass. 2010) (quoting *New York v. United States*,

26  505 U.S. 144, 156 (1992)) – especially where, as here, the federal government has zero stake in
    the outcome of this case.  *See also Levenson I*, 560 F.3d at 1149 n.4 ("I should note that marriage

27  is a status traditionally established and regulated by state law.");  *Dragovich*, slip op. [Tab D] at
    22 (characterizing DOMA's effect as "robbing states of the power to allow same-sex civil

28  marriages that will be recognized under federal law").

1    U.S at 635 (rejecting justifications where "[t]he breadth of the [measure] is so far removed

2    from these particular justifications that we find it impossible to credit them"); *Eisenstadt v.*

3    *Baird*, 405 U.S. 438, 449 (1972) (law discriminating between married and unmarried persons

4    in access to contraceptives "so riddled with exceptions" that the interest claimed by the

5    government "cannot reasonably be regarded as its aim").  Courts take a particularly careful

6    approach to rational basis review where, as here, laws single out and selectively burden

7    disfavored groups, or when important rights are at stake.  *See Romer*, 517 U.S. at 633 ("By

8    requiring that the classification bear a rational relationship to an independent and legitimate

9    legislative end, we ensure that classifications are not drawn for the purpose of

10   disadvantaging the group burdened by the law."); *Lawrence*, 539 U.S. at 580 (O'Connor, J.,

11   concurring in the judgment) ("When a law exhibits such a desire to harm a politically

12   unpopular group, we have applied a more searching form of rational basis review to strike

13   down such laws under the Equal Protection Clause."); *id.* ("We have been most likely to

14   apply rational basis review to hold a law unconstitutional . . . where . . . the challenged

15   legislation inhibits personal relationships" or reflects a "'desire to harm a politically

16   unpopular group.'") (collecting cases); *Kelo v. City of New London*, 545 U.S. 469, 490-91

17   (2005) (Kennedy, J., concurring) (distinguishing between the analysis applied to "economic

18   regulation" and that applied to classifications intended to injure a particular group).

19                    2.    The Interests Asserted by Congress Cannot Support DOMA

20          Congress claimed to advance four interests when it enacted DOMA: "(1) encouraging

21   responsible procreation and child-bearing, (2) defending and nurturing the institution of

22   traditional heterosexual marriage, (3) defending traditional notions of morality, and (4)

23   preserving scarce resources."  *Gill*, 699 F. Supp. 2d at 388 (citing H.R. Rep. No. 104-664, at

24   12-18 (1996)).  As Judges Reinhardt, Wilken and Tauro all recently ruled, these justifications

25   each either constitute an illegitimate interest or bear no rational relationship to DOMA, or

26   both.

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1

          a.     *"Encouraging Responsible Procreation and Child-Bearing"*

2        In *Gill* case, Judge Tauro had no trouble "readily dispos[ing]" of the notion that

3 DOMA was intended to "encourag[e] responsible procreation and child-bearing." *Gill*, 699

4 F. Supp. 2d at 378, 388. He was correct to do so. As Judge Tauro explained, "[s]ince the

5 enactment of DOMA, a consensus has developed among the medical, psychological, and

6 social welfare communities that children raised by gay and lesbian parents are just as likely

7 to be well-adjusted as those raised by heterosexual parents." *Id.* at 388 (collecting

8 authorities); *accord* Holder Letter [Tab A] 3-4 n.6 ("As the Department [of Justice] has

9 explained in numerous filings, . . . many leading medical, psychological, and social welfare

10 organizations have concluded, based on numerous studies, that children raised by gay and

11 lesbian parents are as likely to be well-adjusted as children raised by heterosexual parents.").

12 And in any event, "the ability to procreate is not now, nor has it ever been, a precondition to

13 marriage in any state in the country," *Gill*, 699 F. Supp. 2d at 389, and indeed "the sterile

14 and the elderly are allowed to marry," *Lawrence*, 539 U.S. at 605 (Scalia, J., dissenting).

15        Moreover, the vast majority of the laws DOMA affects have little if anything to do

16 with parenting or children generally. This case, for example, has absolutely nothing to do

17 with procreation or child-bearing. The Debtors have no children; they merely want to file a

18 joint bankruptcy petition. Stripping them and other validly married couples like them of that

19 right helps no one. *Cf. Moreno*, 413 U.S. at 536-38 (statutory provision designed to "prevent

20 so-called 'hippies' and 'hippy communes' from participating in the food stamp program"

21 failed rational basis scrutiny where its sweeping means were disproportionate to its

22 purportedly narrow ends). And if the Debtors did have children, the wholesale denial of

23 federal rights to the Debtors' family would certainly not benefit those children. *See*

24 *Levenson II*, 587 F.3d at 934 ("[DOMA] does not serve any governmental interest in

25 promoting a child-rearing environment, because the children of same-sex couples are eligible

26 for federal benefits and the denial of benefits to same-sex spouses will not affect the

27 decisions made by same-sex couples regarding marriage or parenting.").

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

b.    *"Defending and Nurturing Traditional Heterosexual Marriage"*

Similarly, Congress' stated interest in defending or promoting the institution of "traditional heterosexual marriage" cannot support DOMA. Denying validly married gay and lesbian couples federal rights accorded to heterosexual couples bears no conceivable relationship to the likelihood that they, or anyone else, will enter or remain in a "heterosexual marriage." Indeed, as Judge Reinhardt noted, this justification makes little sense insofar as the couples whose rights are denied by DOMA are already married: "Where, as here, the couple involved is already married, those decisions [about whether and whom to marry] have already been made." *Levenson II*, 587 F.3d at 932. *See also Gill*, 699 F. Supp. 2d at 389 ("[T]his court cannot discern a means by which the federal government's denial of benefits to same-sex spouses might encourage homosexual people to marry members of the opposite sex."); *Dragovich*, slip op. [Tab D] at 24 ("The exclusion of same-sex couples from the federal definition of marriage does not encourage heterosexual marriage."). Furthermore, "denying marriage-based benefits to same-sex spouses certainly bears no reasonable relation to any interest the government might have in making heterosexual marriages more secure." *Gill*, 699 F. Supp. 2d at 389; *see also Levenson II*, 587 F.3d at 934 ("Excluding from health care coverage spouses of employees who have entered into legally binding relationships does not serve the government's interest in promoting long-term relationships.").

"What remains, therefore, is the possibility that Congress sought to deny recognition to same-sex marriages in order to make heterosexual marriage appear more valuable or desirable. But to the extent that this was the goal, Congress has achieved it 'only by punishing same-sex couples who exercise their rights under state law.' And this the Constitution does not permit." *Id.*; *see also Levenson II*, 587 F.3d at 932 ("denying married same-sex spouses health coverage is far too attenuated a means" of achieving this objective); *Moreno*, 413 U.S. at 534. This putative "interest" provides no rational justification for DOMA.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.    *"Defending Traditional Notions of Morality"*

Congress also attempted to justify DOMA by asserting an interest in defending "traditional notions of morality."  As the Supreme Court has repeatedly explained, however, "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." *Lawrence*, 539 U.S. at 577 (citation omitted). *See also Romer*, 517 U.S. at 634-35 ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.") (quoting *Moreno*, 413 U.S. at 534); *Cleburne*, 473 U.S. at 448.  The Constitution does not permit the federal government to advance its "traditional" notion of morality by imposing unique burdens on same-sex married couples.  *See, e.g.*, *Levenson II*, 587 F.3d at 932 ("*Romer* makes clear that a simple desire to treat gays and lesbians differently is not, in and of itself, a proper justification for government actions. Discrimination against gays and lesbians, or same-sex couples, must, at the very least, serve some more substantial and lawful function.").

d.    *"Preserving Scarce Resources"*

Finally, Congress sought to justify DOMA by asserting an interest in preserving scarce resources.  The history of DOMA, however, indicates that Congress made no effort to tailor its legislation to this particular goal:  "though Congress paid lip service to the preservation of resources as a rationale for DOMA, such financial considerations did not actually motivate the law.  In fact, the House rejected a proposed amendment to DOMA that would have required a budgetary analysis of DOMA's impact prior to passage." *Gill*, 699 F. Supp. 2d at 390 n.116 (citations omitted).  Furthermore, although DOMA drastically amended the eligibility criteria for a vast number of different federal benefits, rights, and privileges that depend upon marital status, the relevant committees did not engage in a meaningful examination of the scope or effect of the law.  For example, Congress did not hear testimony from agency heads regarding how DOMA would affect federal programs. Nor was there testimony from historians, economists, or specialists in family or child

1   welfare.  Instead, the House Report simply observed that the terms "marriage" and "spouse"

2   appeared hundreds of times in various federal laws and regulations, and that those terms

3   were defined, prior to DOMA, only by reference to each state's marital status

4   determinations.  *Id.* at 379.

5        This Bankruptcy Case is a prime example of how DOMA's denial of rights to validly

6   married same-gender couples will often have no connection to the preservation of federal

7   resources.  The U.S. Trustee has no pecuniary interest in this case, and has surely expended

8   more resources in ascertaining that the "Debtors appear to be two males," Yip Decl. ¶ 2, and

9   in prosecuting the Motion to Dismiss and the Confirmation Objection than could possibly be

10  "earned" through payment of an additional chapter 13 filing fee.[13]  In short, forbidding the

11  Debtors from filing a joint bankruptcy petition will not save the federal government any

12  money.  Similarly, in *Golinski II*, Chief Judge Kozinski noted that the employee in question

13  "is already signed up for a family [health insurance] plan to cover the child of the marriage,"

14  and "[a]dding her wife's name to the plan would cost the government nothing."  587 F.3d at

15  960.  *Accord Levenson II*, 587 F.3d at 933 ("Further, the application of DOMA in this

16  context [health insurance] frequently saves the government no money at all.").

17       In all respects, even if Congress could rationally have believed that DOMA would

18  conserve scarce resources, this putative interest does not justify DOMA: "a concern for the

19  preservation of resources standing alone can hardly justify the classification used in

20  allocating those resources."  *Plyler*, 457 U.S. at 227.  Any denial of benefits to a particular

21  group might be deemed to conserve resources, but the question, at the very least, is whether

22  Congress selected a valid and rational line by which to impose the burdens of cost-cutting.

23  *See id.* (the government "must do more than justify its classification with a concise

24  expression of an intent to discriminate"); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969)

25  ("[a state] must do more than show that denying welfare benefits to new residents saves

26

27  _____

    [13]   That is, to the extent it could be argued that the extra filing fee Debtors would have to pay to file

28      two petitions would be "revenue," the additional administrative burdens of having two cases (not
        to mention the judicial resources consumed by resolving the inevitable motion to substantively
        consolidate the two cases) surely outweighs any marginal net filing-fee gain to the government.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

money"), *overruled in part on other grounds by Edelmann v. Jordan*, 415 U.S. 651 (1974). As Judge Tauro reasoned, "[t]his court can discern no principled reason to cut government expenditures at the particular expense of plaintiffs, apart from Congress' desire to express its disapprobation of same-sex marriage.  And 'mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable [by the government]' are decidedly impermissible bases upon which to ground a legislative classification." *Gill*, 699 F. Supp. 2d at 390; *see also Levenson II*, 587 F.3d at 933 ("There is no rational relationship between the sex of an employee's spouse and the government's desire to limit its employee health insurance outlays; the government could save far more money using other measures, such as by eliminating coverage for all spouses, or even every fifth or tenth spouse.").

### 3.    DOMA Advances No Other Valid Governmental Interests

The "interests" Congress actually identified to justify DOMA are so indefensible or irrational that, in the recent challenges to the statute in the Northern District of California and the District of Massachusetts, the government "disavowed Congress's stated justifications for the statute," *Gill*, 699 F. Supp. 2d at 388, and instead "assert[ed] a post-hoc argument" that was never a stated basis on which the law was passed, *Dragovich*, slip op. [Tab D] at 22. Specifically, the government argued that DOMA is justified by its desire to "preserve the 'status quo'" or to "proceed incrementally" as the contentious debate regarding same-sex marriage plays out in the states, to eliminate "state-to-state inconsistencies in the distribution of federal marriage-based benefits," and to ease the administrative burden presented by "a changing patchwork of state approaches to same-sex marriage." *Gill*, 699 F. Supp. 2d at 390-95; *accord Dragovich*, slip op. [Tab D] at 22-23.  Both Judge Wilkin and Judge Tauro determined that these new justifications fared no better than the law's original justifications.

### a.    *"Preserving the Status Quo"*

The federal government's desire to "preserve the status quo" or to "proceed incrementally" pending resolution of a socially contentious debate in the states regarding allowing same-sex couples to marry provide no support for DOMA.  As a threshold matter, this rationale "relies on a conspicuous misconception of what the status quo was at the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

32

1     federal level in 1996." *Id.* at 393.   DOMA did not maintain the status quo but rather

2     drastically altered the status quo.   At the time Congress enacted DOMA, "the status quo at

3     the federal level was to recognize, for federal purposes, any marriage declared valid

4     according to state law.     Thus, Congress' enactment of a provision denying federal

5     recognition to a particular category of valid state-sanctioned marriages was, in fact, a

6     significant departure from the status quo at the federal level." *Id.*; *see also Levenson II*, 587

7     F.3d at 933-34.

8          Moreover, "preserving the status quo" and "proceeding incrementally" are not

9     government interests in and of themselves.   At best, they are merely descriptions of what a

10    law does; they are not reasons for doing it: "[s]taying the course is not an end in and of itself,

11    but rather a means to an end." *Gill*, 699 F. Supp. 2d at 390-94.   These rationales also fail

12    insofar as they imply that the federal government has a valid role to play in shaping this

13    socially contentious debate. As set out in more detail below, the federal government has no

14    such interest because the field of domestic relations, including marriage, is reserved for the

15    States. *See id.* at 390-95.

16                              b.     *"Eliminating Inconsistencies and Easing Administrative Burden"*

17          Judge Tauro also correctly found that the putative interest in eliminating "state-to-

18    state inconsistencies in the distribution of federal marriage-based benefits," or in easing the

19    administrative burden presented by "a changing patchwork of state approaches to same-sex

20    marriage," likewise must fail.    "Decidedly, DOMA does not provide for nationwide

21    consistency in the distribution of federal benefits among married couples.   Rather it denies to

22    same-sex married couples the federal marriage-based benefits that similarly situated

23    heterosexual couples enjoy." *Id.* at 394.   Furthermore, eligibility requirements for marriage

24    have varied widely over time and across states, and they continue to vary from state to state,

25    for example, with respect to age requirements. *Id.* at 390-95.   Nevertheless, the federal

26    government has never before found such inconsistencies to be a problem, and it continues to

27    tolerate inconsistency in every respect other than sexual orientation.   A claimed interest in

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

33

1   "consistency" cannot support a law that treats similarly situated individuals differently.  *See*

2   *id.* at 394-95.

3        Similarly, differing state laws with respect to the ability of same-sex couples to marry

4   create no administrative burden for the federal government, because the federal government

5   is not burdened with the task of implementing these changing laws.   Rather, the federal

6   government simply takes those couples that have obtained state-sanctioned marriage licenses

7   as it finds them.   This task is not made administratively more difficult simply because some

8   of those couples are of the same gender, or because some of those couples previously did not

9   qualify for marriage.   *Id.* at 395.   To the contrary, attempting to pick out those validly

10  married couples who are same-gender would appear to be more administratively difficult.

11  Tax and bankruptcy forms do not generally require specification of gender or sexual

12  orientation, and the U.S. Trustee's office in this case felt compelled to submit a sworn

13  declaration to the effect that "Debtors appear to be two males."  Yip Decl. ¶ 2.  The costs of

14  gender policing are likely to far outweigh any alleged administrative convenience in denying

15  rights to same-gender couples.

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

# VI.

# CONCLUSION

For all the reasons set out above, the Debtors respectfully request that the Court deny the Motion to Dismiss, overrule the Confirmation Objection, and grant such other and further relief as may be warranted.

Dated:   April 27, 2011                     KLEE, TUCHIN, BOGDANOFF & STERN LLP


                                            ___/s/ Robert J. Pfister_____
                                            DAVID M. STERN (State Bar No. 67697)
                                            ROBERT J. PFISTER (State Bar No. 241370)
                                            1999 Avenue of the Stars, 39th Floor
                                            Los Angeles, California 90067-6049
                                            Telephone:   (310) 407-4000
                                            Facsimile:   (310) 407-9090
                                            Email:       dstern@ktbslaw.com
                                                         rpfister@ktbslaw.com

                                            *Special Counsel for the Debtors*


                                            LAW OFFICE OF PETER M. LIVELY


                                            ___/s/ Peter M. Lively_____
                                            PETER M. LIVELY (State Bar No. 162686)
                                            11268 Washington Boulevard, Suite 203
                                            Culver City, California 90230-4647
                                            Telephone:   (310) 391-2400
                                            Facsimile:   (310) 391-2462
                                            Email:       PeterMLively@aol.com

                                            *Counsel for the Debtors*

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

## DECLARATION OF GENE DOUGLAS BALAS

I, Gene Douglas Balas, hereby declare under penalty of perjury that:

1.     Together with Carlos A. Morales, I am one of the debtors in this chapter 13 bankruptcy case.  I respectfully submit this declaration in opposition to the U.S. Trustee's Motion to Dismiss and in response to the U.S. Trustee's Confirmation Objection.  I am over eighteen years of age and have personal knowledge of the facts set forth herein; if called as a witness, I could and would testify competently with respect thereto from my own personal knowledge.

2.     Carlos and I were married in California on August 30, 2008, and we remain married to this day.  We publicly hold ourselves out as a married couple, and our family, friends and business associates recognize us as such.

3.     All the property that either of us owns is community property, and all of our debts are community debts.  We have no prenuptial agreement, postnuptial agreement or transmutation agreement.  We view everything as belonging to (or owed by) us as a couple. There is no "his" and "mine"; everything is "ours."

4.     I understand that the U.S. Trustee is asking the Court to dismiss our bankruptcy case because our marriage does not "count" under federal law.  According to DOMA, Carlos and I are no more than strangers (or possibly roommates).  It is hurtful to hear my own government say that my marriage is not valid for purposes of federal law.  To show why this makes no sense, I would like to share the story of how we met, fell in love, married, and built a life together.

5.     Since childhood, I've known that I was "different."  It wasn't until I reached puberty that I realized that that "difference" is being gay.  It isn't just a sexual attraction to other men; rather, it is also a spiritual and emotional bond I also seek with another man.  It is an innate part of me – just as I am right handed – and it is something that cannot be changed, nor was it a "choice."  It would seem equally unnatural for me to try to love a person of the opposite sex as it would be for me to write with my left hand.  My orientation to seek to bond with a person of the same gender is fundamental to who I am, how I approach the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

36

1    world, and whom I love.  And "love" is the operative word: it transcends the mere sexual and

2    physical to encompass the entirety of the person with whom I wish to commit my life.  It is

3    impossible to strip gender out of one's soul, heart and mind; I am a man in every sense of the

4    word, and the person I love can only be the same.

5        6.    I've had crushes on other men since I was in high school, and it was very

6    lonely for me not to have a partner, or even a date, until after I left Youngstown, Ohio, to

7    move to Houston to attend school when I was 17.  I immediately went on a quest to find a

8    soul mate.  In that regard, I eventually became successful after a long period of isolation and

9    depression that being gay in a straight world can bring, and I met my first partner, George, in

10   December 1987 at the age of 19 when I was a student at the University of Houston.  He was

11   21 at the time.  He was diabetic and, unbeknownst to me, he was also HIV positive.  Six

12   months into our relationship, in May 1988, I became infected with HIV from George and we

13   decided to make a life change.  We had already exchanged rings and demonstrated our

14   commitment to each other; now, we wanted to commit to trying new life experiences, as we

15   did not know how long we had to live.

16       7.    In January of 1989, we packed our meager belongings and moved sight unseen

17   from Houston to Los Angeles, and given my partial education in finance and solid work

18   history (while attending the University of Houston on a full National Merit scholarship, I

19   worked full time and went to school full time), I soon landed a job at an investment bank, at

20   the age of 20 as a research assistant.  My career on Wall Street was then launched, but

21   George's was coming to a close: he was losing his eyesight and his kidneys were failing due

22   to diabetes, and he went on disability.  Given his illness, our relationship was no longer

23   physical, but one based on love, caring, and emotional and spiritual intimacy and mutual

24   support for each other.

25       8.    My goal was to take care of George so that he could live the short remainder of

26   his life without concern for money or living expenses.  I worked 80 hours a week at two jobs

27   to support the two of us, and to this day I regret not spending more time with George while

28   he stayed at home, isolated, while I worked to support our household and his medical bills.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

37

It was an unfortunate necessity that life brought, and one which haunts me to this day of how lonely George was at home while I left for work at 4:45 a.m. to arrive for work at 6:00 a.m. and leaving work at my second job at 10:00 p.m. and not arriving home until 11:30 p.m. The bills, including his medical expenses, needed to be paid, however.

9.      George wanted to return to Houston to die near his family. My employer, which treated us as a couple, transferred me to Houston for the purpose of bringing George back to his family for the remainder of his life, and so that I could finish school at the University of Houston. We packed our U-Haul and moved back to Houston in January of 1991. On September 14, 1991, at the age of 25, George died of AIDS and diabetes, only a few days after I turned 23. We had been together almost four years.

10.      I paid for the funeral myself; his family gave me a check for half the cost at the funeral home but then stopped payment on the check. George's death devastated me, and I turned my focus to work. I worked every single day, including weekends and holidays, from September 1991 to May 1992, all while attending school full time. I had nobody to turn to, and nobody to talk to. I was horribly lonely, miserable and overwhelmed with grief. I couldn't bear to be home alone in the eerily empty house. I didn't know what else to do other than work. That behavior pattern would eventually become my downfall.

11.      When my firm transferred me to New York in March of 1993, I welcomed the distraction, and for many years after moving to New York had a singular focus on my career, getting my Chartered Financial Analyst designation in 2000 (a process that took three years), followed by getting my MBA from Columbia Business School in 2003 in a full time program while working full time. After that point, I was getting older, and getting lonely. I wanted a partner once again.

12.      Since religion had always been important to me, and I was a member of an Episcopal church in New York for a number of years, on the evening of September 2, 2005 during the Labor Day weekend, I prayed intently with a friend from my church for me to find a partner. After my friend was tired, I left her apartment and went to Oscar Wilde, a bar on New York's Upper East Side. I saw Carlos, and was instantly attracted. I went over,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

1    introduced myself, and that sparked a whole chain of events that would soon follow.   It

2    turned out my prayers earlier that evening had been answered.

3         13.    The next day, Carlos came over to my apartment in Jersey City to enjoy the

4    rooftop pool.  From then on, we were inseparable, and as events transpired, our relationship

5    together helped us both endure a number of tribulations that afflicted each of us.  To begin,

6    my work hours became increasingly challenging even as my relationship with Carlos was

7    building.  Carlos would leave his evening job as a graphic design specialist at a management

8    consulting firm in midtown Manhattan, where he worked from 2:30 p.m. to 10:30 p.m., and

9    arrive at my Jersey City apartment around 11:00 p.m., only to find me often still at the office,

10   where I had started my workday before 9:00 a.m.  Carlos' visits were the delight of my day,

11   to come home from work to find Carlos waiting for me.  I was thrilled to have someone in

12   my life, especially someone who would be patient with me and my schedule.

13        14.    One night, he surprised me with a gift that I had found so thoughtful: a butter

14   dish, beautifully gift-wrapped.  While seemingly such a small item, it was the thought behind

15   it that was so touching: the thoughtful observation that I needed a simple butter dish since I

16   kept sticks of butter lying in my kitchen cupboards in their wax paper wrappers.  It was the

17   nicest thing anyone had ever done for me in the 14 years since George died.

18        15.    In January of 2006, we moved in together to a new apartment in the same

19   building in which I was living, with both our names on the lease.  It was our first joint

20   commitment.  Carlos brought me such joy – finally – in a life that had been isolated, lonely

21   and devoid of love and happiness for 14 years, and I was elated to have found him and to

22   begin our life together.

23        16.    By the time Carlos and I moved in together, I was working 90 or more hours a

24   week.  Long hours are part and parcel of working on Wall Street, but are usually reserved for

25   younger, more junior associates and not for someone older and more advanced in their

26   career, such as myself.  In my twenties, working so many hours was not problematic.  In my

27   late thirties, I no longer had that stamina.  As my workweek lengthened and weekends

28   evaporated, I became increasingly stressed.  My work patterns that I embraced to cope with

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

39

George's death were no longer working for me, but against me.  I remembered the lonely hours George spent while I was at work, and I vowed to never let work come between Carlos and me.  I wanted to spend more time with Carlos; I needed to find another job.  Carlos also wanted to return to Los Angeles to be close to his mother, who was aging.

17.    I began interviewing with a new firm in Los Angeles in April of 2006.  Carlos and I then decided that we were going to commit to each other, and that we were going to live our lives as a couple.  We entered a New Jersey domestic partnership in May of 2006, and celebrated our union with lunch at a restaurant near city hall, as my work schedule did not permit anything more.  I returned to the office, and a coworker remarked, "You look happy.  Why?"  I excitedly exclaimed, "I just got married!" and proudly pointed to the ring newly planted on my finger.  For my coworkers who probably had never seen me do anything but work and who might have thought I had no social life whatsoever, this must have come as a complete shock.

18.    After that, in mid-May, I returned to the firm I was interviewing at in Los Angeles for another set of interviews.  During some spare time, Carlos, who stayed home in Jersey City, gave me directions from Google Maps while I drove around the neighborhood in East Los Angeles where he grew up.  His virtual visit of Los Angeles with my descriptions of his old haunts over my cell phone brought back nostalgic memories for him and he did want to be close to his aging mother.

19.    My interview with the president of the firm I was considering took a very unpleasant turn when he told me that he preferred to hire a different candidate because the other person competing for the job was a "married man with a wife," and therefore presumably had a more legitimate reason to be relocated to Los Angeles.  I felt hurt that my relationship with Carlos was somehow diminished because I was a "partnered" instead of married.

20.    I did ultimately get a job offer.  But back in New York on Memorial Day weekend of 2006, my lack of sleep from my work hours and continued stress took its toll.  I had what I thought was a stroke, in which I experienced paralysis and was unable to move.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

Carlos called 911 to take me to the emergency room. I was diagnosed with acute stress, and Carlos was by my side the whole time in the hospital. I don't know how I would have managed without his support.

21. I got out of the hospital after a few days, and although I was still reluctant, I accepted the job offer in Los Angeles. There was to be, however, no letup from the stress for either of us. I had another hospitalization for acute stress in June, this time for a week, while Carlos was also experiencing significant stress of his own. Then, as we were packing our things to move to Los Angeles in mid-July 2006, Carlos experienced what seemed like a heart attack at the time, and he was hospitalized himself for several days with acute stress and conversion disorder. The day after he was released from the hospital, we boarded a plane to move to Los Angeles to continue our lives together.

22. We obtained our California domestic partnership status, as it was important to establish our relationship as a committed couple in California. Our hospital stays reminded us just how important it would be for one of us to be able to visit the other in the hospital or make medical decisions for each other. By this time, all of our finances were joint: we had a joint bank account, a joint brokerage account, and Carlos was beneficiary of my life insurance and vice versa. We paid all our bills from our joint account, shopped for groceries together, made major decisions jointly and spent most of our free time together. We even picked out a church together, since religion is important to me and we wanted to find a church home where we both could be happy. We joined a Unitarian Universalist church in Santa Monica.

23. The next few years were stressful as well. It took time for Carlos to find a job. Carlos did start working again, only to need to leave that job in a few months to be by his mother's side, as she had fallen ill and was hospitalized for over four months before passing away. I was with Carlos during this very difficult time, and luckily my income had helped support us both for the ten months that he wasn't working. During this period when Carlos wasn't working, following our move to Los Angeles and during Carlos' mother's

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

41

hospitalization, we jointly incurred debts to cover our living expenses, with me taking on debt to help make up the difference for Carlos' lost income, and Carlos doing the same.

24.     Even though my salary supported both of us while Carlos wasn't working, it wasn't entirely sufficient and we both took on debts to provide for our joint living expenses. We never saw it as "my" income and "his" income or Gene's debts or Carlos' debts.  It was "our" income and debt.  Carlos was covered under my employer's health insurance plan, which was vital since we never could afford a private health insurance plan for Carlos with our budgets tight with just my income to support the two of us.

25.     For a while, we did enjoy some calm.  Our happiest day together, our wedding, came on Labor Day weekend in 2008, the same holiday weekend during which we had met in 2005, so we could make Labor Day weekend the "right" anniversary.   We held our ceremony in the church where we had become very involved: I was the Treasurer, on the Board of Directors and on the executive committee of the church. It was the perfect opportunity for us to celebrate – finally – becoming lawfully wedded spouses in a community that saw us as nothing other than a married couple.

26.     We went to company picnics and holiday office parties together.  I went to his company functions as his spouse, and his coworkers treated us as such.  My family views us as a unit, and so does his family.  Our neighbors do, too, and even the clerks at Walgreen's pharmacy or the woman at the dry cleaners who always knows that I am picking up Carlos' dry cleaning or vice versa.  Having this oasis of family stability in our household has helped us deal with all of the stress from the outside world to that point, but more was yet to come.

27.     In March of 2009, at the height of the financial crisis, when the stock market fell to a twelve year low, I lost my job when my company laid off 1,000 people.  While it is always unpleasant being laid off, I needed the time off: I had been working continuously – and, for the most part, excessively – since 1984, and I needed a long rest.  However, my income had gone from $200,000 a year to just $475 a week on unemployment, and Carlos' income was nowhere near sufficient to pay our bills, which we paid out of our pooled funds.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

42

1   Luckily, given my medical conditions, I am covered under Carlos' employer's medical plan,

2   and it is a vital lifeline to us for his employer to treat us as a married couple.

3        28.    Otherwise, I don't know what I'd do without being covered by Carlos'

4   insurance, as it would be impossible to obtain a health care plan on my own and I wouldn't

5   have been able to afford COBRA coverage without Carlos' income to support me.  Carlos

6   was extremely supportive emotionally as well as financially, and I put him through

7   tremendous stress as I interviewed for jobs in cities all across the country, many of which

8   were places neither of us desired to live.  We would, however, consider as a couple any job

9   opportunities I might have; I would never consider taking a job without Carlos' buy-in,

10  especially as we would likely have to relocate.  Many of the jobs I had considered were in

11  states that did not recognize our relationship, and we were extremely reluctant to consider

12  them, given how the legal recognition of our relationship has been vital to both our finances

13  and our medical issues over our years together.

14       29.    Carlos' stress from my unemployment and long job search and the uncertainty

15  it entailed did take a toll on him, and while I was unemployed, he went out on disability.

16  Our finances took a huge hit, and we depleted our savings.  We withdrew funds from our

17  retirement accounts to fund our joint living expenses.  After a year, I began working again as

18  a free-lance writer for a financial website, but make 80% less than what I did before.  Having

19  exhausted our savings, bankruptcy became the only option.

20       30.    Now, we need to adjust to life with a lot less money, and Carlos is now the

21  primary breadwinner of the family.  The reversal of fortunes has been difficult for both of us,

22  but as Carlos told me, "I didn't marry you for your money."  We now must adjust to a very

23  different lifestyle than we had before, but we always are thankful we have each other.  We

24  are in this together, and we remind ourselves each day of the stresses we've been through

25  together and how those events have made our relationship stronger and more resilient.  We

26  talk about growing old together and what we might be like when we are in 70's and think of

27  where we might want to retire.

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

31.    The health of our relationship is demonstrated in everyday rituals. We go grocery shopping together, but I know he likes Fuji apples and hates carrots, and he knows that I like Red Delicious apples and hate celery. I do all of the cooking; he does all of the cleaning. I write out the checks but he does all of the filing. We eat dinner together at home every night, and we pray together every day before we eat. We now go to a different church than we did before, but it is one that we picked out together, and it is one that we both like. We depend on each other for emotional support as we continue to go through uncertainty, as I still need to find another job with more income, and the uncertainty of where we might be living continues to be a major stressor. Additionally, it is hurtful to have our own government argue that we are not legally married for purpose of federal law.

32.    However, we never let the stress come between us. We never "fight" in the angry sense of the word. We have disagreements, and we may become upset with each other, but it never lasts for long and we have never even raised our voices to each other. Instead, we talk about the issues we face and discuss our feelings to each other rationally and calmly. We listen to what each other is saying – and feeling – and never yell or scream at each other. In this respect, our relationship is ideal: a tranquil, stable bond that unites the two of us in the midst of the turmoil of the outside world. It is this bond that keeps us sane and centered. Without it, I do not know what I might have done on my own in the face of a very challenging five and a half years. God has indeed answered the prayers I made that evening just hours before I met Carlos, the love of my life.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on April 27, 2011 at Los Angeles, California.

GENE DOUGLAS BALAS

44

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

## DECLARATION OF CARLOS A. MORALES

I, Carlos A. Morales, hereby declare under penalty of perjury that:

1.  Together with Gene Douglas Balas, I am one of the debtors in this chapter 13 bankruptcy case. I respectfully submit this declaration in opposition to the U.S. Trustee's Motion to Dismiss and in response to the U.S. Trustee's Confirmation Objection. I am over eighteen years of age and have personal knowledge of the facts set forth herein; if called as a witness, I could and would testify competently with respect thereto from my own personal knowledge.

2.  Gene and I were married in California on August 30, 2008, and we remain married to this day. We publicly hold ourselves out as a married couple, and our family, friends and business associates recognize us as such.

3.  All the property that either of us owns is community property, and all of our debts are community debts. We have no prenuptial agreement, postnuptial agreement or transmutation agreement. We view everything as belonging to (or owed by) us as a couple. There is no "his" and "mine"; everything is "ours."

4.  I understand that the U.S. Trustee is asking the Court to dismiss our bankruptcy case because our marriage does not "count" under federal law. According to DOMA, Gene and I are no more than strangers (or possibly roommates). It is hurtful to hear my own government say that my marriage is not valid for purposes of federal law. To show why this makes no sense, I would like to share the story of how we met, fell in love, married, and built a life together.

5.  Since I was five, I knew I had an attraction towards members of my own gender. Not fully understanding the meaning of sexual orientation, I knew this attraction made me different from the other boys I knew at the time. I had even developed schoolboy crushes on other boys in my class; however, I kept those to myself because even at this young age, I knew that somehow, this disclosure would have met with disapproval among my peers and family.

6.     I was born and raised in East Los Angeles, a place rooted in deep traditional Latino and Catholic traditions.  Homosexuality was considered taboo.  It wasn't until my college years at U.C. Santa Barbara that I started to acknowledge that perhaps I was not meant to follow a traditional path of a relationship with a woman.  However, I did not pursue any relationships with men because I was not yet willing to fully accept that my sexual orientation was different, as it went against everything I had been raised to believe.

7.     In 1990, I fully acknowledged and accepted the fact that I am gay.  However, after coming out to myself and to friends, I was still not comfortable coming out to the rest of my family.  I knew that in order to develop as a fully independent young gay man, I had to break with some of the family ties and move on my own.  Shortly after coming out to my mother, I decided to move to New York to pursue career and life opportunities, and in October 1993, I sold most of my belongings and moved to New York to start a new life.

8.     While in New York, I had a couple of short-term relationships but it wasn't until Labor Day weekend of 2005 that I had met someone who would have a major impact on my life.  I first met Gene after spending a quiet Friday evening with some friends, who are both men in a stable, committed and loving relationship with one another.  As the evening was winding down, I decided to stop at a neighborhood bar before heading home.  That is where I met Gene.  After our introductions, his firm handshake sealed the deal.  I felt that I had met someone with whom I could see myself spending the rest of my life.

9.     I had an instant attraction to Gene that went beyond the physical.  I felt an instant bond and connection with him.  I had found a soul mate.  We dated for a few months before he asked me to move in with him.  At first I was reluctant, given that I had been living on my own for several years and was no longer accustomed to sharing a living space – let alone my life – with anyone.  But, with Gene I felt that this could have the potential for a long-term, steady and stable relationship that I did not have with anyone else.  A few months after meeting Gene, we moved in to a new apartment in Jersey City.  I broke my lease of my Manhattan apartment and took all of my belongings with me, including two cats.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

46

10.     Shortly after moving in with Gene, his work load and hours increased. I saw him briefly early in the morning and late in the evening before and after work, often arriving home from work after midnight. I began to notice the toll the work load had taken on him and it was beginning to affect me as well. He was constantly fatigued and I began to worry about his health. At one point he came down with pneumonia but only missed a day of work (and still worked from home that day). The stress of deadlines and his workload gave me cause for concern. I was worried that this would have a negative impact on his overall health.

11.     One Saturday morning, he yelled out my name. I noticed the panicked look on his face and knew something was seriously wrong. He complained of numbness and lack of mobility in his arms and legs. I immediately called 911 and they arrived and took him to the hospital. I rode along with him in the ambulance to a nearby hospital where I sat with him in the emergency room while the doctors treated him and tried to diagnose him. He was later admitted and I spent the entire Memorial Day weekend by his side comforting him in any way I could. The doctors would later diagnose his condition as stress-related. I was relieved that it had not been a stroke. I spoke with the doctors and gave them what little medical history I knew at the time since we had only been living together for a short period of time.

12.     During Gene's hospitalization, I called his relatives who were nearby and updated them on Gene's condition. They saw me as his partner and caretaker, and not once objected to me being by his side. After his discharge from the hospital, Gene and I realized that in order to make this relationship stronger, we had to learn more about each other's medical histories to better handle such situations should they arise again. Gene's workload did not get better; it actually worsened as his hospitalization set him back.

13.     Prior to his hospitalization, Gene had begun to look for work elsewhere, including outside of New York. I knew his job search had the potential to take him out of the area, and I had to make a decision to commit to this relationship or move on. Without hesitation, I agreed to follow him to wherever this new job would take him. After his first hospitalization, I was even more committed to Gene as my lifelong partner. He began the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

interview process with a financial firm in Los Angeles.  I had spent a good 20 years away

from L.A. and was ready to move back to be close to family.  I was no longer the naïve and

worried young man afraid of how my family might react to me being gay.  This time, I was

in a committed relationship about which I felt strongly and had the confidence in myself and

in my partner to be able to face any situation.

14.    If any proof was needed of our level of commitment, it came when we went to

city hall on a morning in early May 2006 to be registered as New Jersey domestic partners.

We knew we had to take the next step in our relationship to make it solid, especially since

we were planning to move across the country.  And, as another test to our commitment, Gene

underwent a second hospitalization one month after the last, also due to stress-related illness.

The move, combined with the two hospitalizations, began to affect me as well.  I had

undergone a tremendous amount of stress being a caretaker and planning a move across the

country.  I underwent a hospitalization of my own on my birthday, two days before we had

to catch a flight to Los Angeles.  Upon arriving in the emergency room, I was treated for a

possible heart attack but the tests were negative for any heart problems and the doctors said it

was a stress-related illness.  Nevertheless, I boarded a plane less than 48 hours after leaving

the hospital to be with Gene out in Los Angeles and began a new life, hopefully free from all

the troubles we had while living in Jersey City with Gene working those long hours.

15.    In Los Angeles, we lived off Gene's income for a few months.  Fortunately,

Gene's employer provided domestic partner benefits as COBRA premiums from my former

job would have drained our savings.  I also took this time to reconnect with my mother who

was living in Los Angeles.  She still had issues with my being gay – and especially with me

being in a relationship with another man.  However, as I spent more time with her, she began

to warm up to the idea of my relationship and my level of commitment.

16.    Unfortunately, shortly after my arrival to Los Angeles, my mother had an

accident at her home and had to be hospitalized.  I had just started working and now had to

balance being a caretaker and working full time, which was not easy.  My mother spent four

months in the hospital and nursing home before she passed away.  During the time my

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

mother was ill, Gene met several of my family members and friends of my mother.  My family turned out to be quite open-minded about my relationship with Gene.  They saw us as a committed couple, especially after witnessing for themselves the level of commitment Gene and I displayed towards one another.  Gene was by my side supporting emotionally as well as financially, since I had to leave my job to take care of my mother while she was ill.

17.    On the day my mother passed away, my family and her friends gathered in the hospital room to say goodbye.  Gene left work early to meet me there and was by my side. My mother quietly passed away later in the night.  The following day, Gene took the day off from work to be with me and help me go through the business of handling the details of her passing.  He, along with a friend of my mother's, joined me at the funeral home to make the arrangements, as he had been through the ordeal of planning a loved one's funeral with the death of his partner many years before, and that of his father more recently.  Gene provided the comfort and support I need to get through this difficult time; all the while, my family and friends acknowledged him as an important part of my life.

18.    I soon began working full time again as a presentation specialist, a role which I had done at my previous employer in New York.  From the beginning, my employer offered domestic partner benefits, which covered Gene, who was also the main beneficiary of my life insurance.  Even though we already were registered as domestic partners in New Jersey, Gene and I decided to register as domestic partners in California.  We wanted to be certain that our relationship would be recognized by our new home state.

19.    By this point our lives had become fully integrated.  We had long since opened a joint checking account, named each other as beneficiaries in our life insurance and employee health insurance.  We were living as a single, joint unit instead of two separate individuals.  We would cook for each other, share household responsibilities, care for our cats, and even pick a church to attend and then become members.

20.    There was no doubt in our minds as to what to do next, once the California Supreme Court ruled in favor of same-sex marriage.  On August 30, 2008, we were legally married.  We held our ceremony at our church, the Unitarian Universalist Community

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

Church of Santa Monica.  In front of friends and family, we exchanged our vows and made it official.  It was one of the happiest days of my life.  After all we had been through to this point, it only made sense to sanctify our commitment to one another for the world to see.

21.    We plan for old age and retirement together; there is no doubt that we are committed to each other for life.  We are a single unit.  We live our lives together, and our finances are joint.  Everything we own is each other's.

22.    However, our finances were nothing to celebrate.  During most of my mother's illness, I had been unemployed.  We had only Gene's income to support us, and that was not always enough to get us through.  We found ourselves putting basic necessities such as food and clothing on our credit cards.  Once I began working, we were able to make payments and relied less on our credit cards.  We took measures to reduce our expenses such as moving to a less expensive unit in our complex.  We were managing well, but then in March 2009, Gene lost his job when his company laid off nearly a fifth of its workforce.  Our total income was dramatically reduced and even with a less expensive apartment, it was going to be a difficult challenge to meet our expenses.

23.    We tried all that we could to make ends meet.  We cut back on expenses where we could.  We had only one car instead of two.  I began taking public transportation to work.  We withdrew funds from our retirement savings and borrowed against our 401(k) to meet expenses.  Still that wasn't enough.  Our credit card payments had increased, as well as the interest rates.  Many of our credit card companies were charging interest rates over 30%, which made paying down the balances next to impossible.

24.    After a year of Gene's unemployment, we began to consider bankruptcy as an option.  I had been resistant to the idea, hoping our financial difficulties would only be temporary.  However, after a lengthy period of unemployment and cutting back expenses, I knew that even if our situation were to change for the better, we had incurred such a large amount of debt that it would be difficult to overcome the challenge of paying it down, especially given the exorbitantly high interest rates the credit card companies had been charging.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

25.   Filing bankruptcy would bring a different set of challenges in itself. We knew that because of DOMA, the federal government would not recognize our relationship as legal, even though we are legally married in the State of California. We also knew that filing individually made no sense to us either, because our lives and finances have become so intertwined. It would seem like an impossible task to separate our finances – something akin to a divorce – in order to file individually. The stress of our financial condition and the uncertainty of how we would find relief under the Bankruptcy Code impacted my health and I went out on disability for nearly five months between June 2010 and November 2010.

26.   Filing jointly is the only option we have. Our lives – including our finances – have become inseparable. My income is the main supporter for the both of us. Gene is covered under my employer's health plan, without which his medical expenses would pose a difficult financial challenge. My family, my colleagues at work and our friends fully acknowledge Gene as my spouse. It is imperative that we file jointly as we are married to each other in every sense of the word.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on April 27, 2011 at Los Angeles, California.

_____
CARLOS A. MORALES

| In re:<br>Gene Douglas Balas and Carlos A. Morales<br><br>                        Debtor(s). | CHAPTER 13<br><br>CASE NUMBER 2:11-bk-17831-AA |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067

A true and correct copy of the foregoing document described as  <u>DEBTORS' OPPOSITION TO THE U.S. TRUSTEE'S</u> <u>MOTION TO DISMISS AND RESPONSE TO THE U.S. TRUSTEE'S CONFIRMATION OBJECTION; MEMORANDUM OF</u> <u>POINTS AND AUTHORITIES; DECLARATION OF GENE DOUGLAS BALAS; DECLARATION OF CARLOS A. MORALES</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On  <u>April 28, 2011</u>            I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the e-mail address indicated below:

SEE ATTACHED SERVICE LIST

                                                   ☒ Service Information continued on attached page.

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On  <u>April 28, 2011</u>  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST

                                                   ☒ Service Information continued on attached page.

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P.5 and/or controlling LBR, on  <u>April 28, 2011</u>            I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method ) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

| Via Personal Delivery<br>The Honorable Alan M. Ahart<br>U.S. Bankruptcy Court<br>Roybal Federal Building<br>255 E. Temple Street, Suite 1382<br>Los Angeles, CA 90012-3332 | Via Personal Delivery<br>The Honorable Thomas B. Donovan<br>U.S. Bankruptcy Court<br>Roybal Federal Building<br>255 E. Temple Street, Suite 1352<br>Los Angeles, CA  90012-3332 | Via Personal Delivery<br>Office of the United States Trustee<br>Attn:  Peter C. Anderson<br>725 S. Figueroa Street, Suite 2600<br>Los Angeles, CA  90017 |
|---|---|---|

                                                   ☐ Service Information continued on attached page.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| <u>April 28, 2011</u> | Rosalind Williams | *Rosalind Williams* |
|---|---|---|
| Date | Type Name | Signature |

130489.1  This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

                                              **F 9013-3.1.PROOF.SERVICE**

| In re:<br>Gene Douglas Balas and Carlos A. Morales<br><br>Debtor(s). | CHAPTER 13<br><br>CASE NUMBER 2:11-bk-17831-AA |
|---|---|

**ADDITIONAL SERVICE INFORMATION (if needed):**

## SERVICE VIA NOTICE OF ELECTRONIC FILING

Kathy A. Dockery (TR)                                  efiling@CH13LA.com

M. Jonathan Hayes                                      jhayes@polarisnet.net
On behalf of Interested Party Courtesy NEF

Peter M. Lively                                        PeterMLively2000@yahoo.com
On behalf of Debtor Gene Balas

Robert J. Pfister                                      rpfister@ktbslaw.com
On behalf of Debtor Gene Balas

United States Trustee (LA)                             Ustpregion16.la.ecf@usdoj.gov

Hatty K. Yip                                           hatty.yip@usdoj.gov
On behalf of United States Trustee (LA)


## SERVICE BY US MAIL

Bank of America
P.O. Box 15026
Wilmington, DE  19850-5026

Chevron Credit Bank
P.O. Box 5010
Concord, CA  94524-0010

Franchise Tax Board
Bankruptcy Section MS A340
P.O. Box 2952
Sacramento, CA  95812-2952

Capital One Bank
P.O. Box 30285
Salt Lake City, UT  84130-0285

Candica L.L.C.
c/o Weinstein and Riley, PS
2001 Western Avenue, Suite 400
Seattle, WA  98121

HSBC Card Services
c/o NCO Financial Systems
P.O. Box 15372
Wilmington, DE  19850-5372

Internal Revenue Service
Centralized Insolvency Operation
P.O. Box 7346
Philadelphia, PA  19101-7346

Park La Brea
6200 W. Third Street
Los Angeles, CA  90036-3157

Carlos A. Morales
5702 Lindenhurst Avenue
Los Angeles, CA  90036-3275

Los Angeles Division
255 E. Temple Street
Los Angeles, CA  90012-3332

BMW Financial Services
c/o Vital Recovery Services, Inc.
P.O. Box 923748
Norcross, GA  30010-3748

Cedars-Sinai
P.O. Box 60109
Los Angeles, CA  90060-0109

Citibank
P.O. Box 26892
San Francisco, CA  94126-0892

FIA Card Services aka Bank of America
c/o Becket and Lee LLP
P.O. Box 3001
Malvern, PA  19355-0701

HSBC Bank Nevada, N.A.
By PRA Receivables Management, LLC
P.O. Box 12907
Norfolk, VA  23541-0907

HSBC Card Services
Hunt & Henriques
151 Bernal Road, Suite 8
San Jose, CA  95119-1491

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA  19101-7346

Sallie Mae
P.O. Box 9533
Wilkes-Barre, PA  18773-9533

130489.1  This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Acura Financial Services
P.O. Box 600001
City of Industry, CA  91716

BMW Financial Services
P.O. Box 3608
Dublin, OH  43016-0306

Chase
P.O. Box 15298
Wilmington, DE  19850-5298

Consultants for Pathology
4607 Lakeview Canyon Rd., Ste. 598
Westlake Village, CA  91361-4028

Franchise Tax Board
Attn:  Bankruptcy
P.O. Box 2952
Sacramento, CA  95812-2952

HSBC Card Services
c/o Hunt & Henriques
151 Bernal Road, Suite 8
San Jose, CA  95119-1306

HSBC Card Services
P.O. Box 81622
Salinas, CA  93912-1622

MD Periodontics
A. Moshrefi, DDS MS & N. Daneshmand
9735 Wilshire Blvd., Suite 211
Beverly Hills, CA  90212-2102

Sallie Mae Inc. on behalf of USA Funds
Attn:  Bankruptcy Litigation Unit E3149
P.O. Box 9430
Wilkes-Barre, PA  18773-9430

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA  19114

Kathy A. Dockery (TR)
700 S. Flower Street, Suite 1950
Los Angeles, CA  90017-4212

BMW Financial Service
P.O. Box 3608
Dublin, OH  43016-0306

Peter C. Anderson, Esq.
Jill M. Sturtevant, Esq.
Hatty Yip, Esq.
Office of the United States Trustee
725 So. Figueroa St., Ste. 2600
Los Angeles, CA  90017

---

130489.1  This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                            **F 9013-3.1.PROOF.SERVICE**